[Civ. No. 38748. Second Dist., Div. Two. Sept. 19, 1972.]

COFFEE-RICH, INC., et al., Plaintiffs and Appellants, v.
JERRY W. FIELDER, as Director, etc., et al., Defendants and Appellants.

## COUNSEL

Flint & Mac Kay, Edwin Freston, Louis W. Myers II, Arnall, Golden & Gregory, Ellis Arnall and Elliott H. Levitas for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Sanford N. Gruskin, Assistant Attorney General, Walter E. Wunderlich and Jeffrey C. Freedman, Deputy Attorneys General, for Defendants and Appellants.

Murphy, Murphy, Black & Williams, Frank Murphy, Jr., and John C. Hamilton as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

**ROTH, P. J.**—Plaintiffs Coffee-Rich, Inc. and Rich Products, separate Delaware corporations with their respective principal places of business in Buffalo, New York, seek a judgment against various officials of the State Department of Agriculture, herein sometimes referred to as defendants or Department, declaring that certain amendments to the Agricultural Code effected by chapter 1250 of Statutes and Amendments (1968) either have no application to the sale in California of their products or that the amending legislation is unconstitutional.[1] Plaintiffs' products, Coffee-Rich and three types of whipped topping, including "Spoon n' Serve" and "Rich's Whip Topping," collectively "Rich Toppings," are used as additives to beverages and solid foods, have been sold in California since 1960 and, in the case of Rich Toppings, with substantial changes in composition, since 1945. In a two-and-a-half-year period commencing in 1967, the most

---

[1]Chapter 1250 enacted as sections 38901-38987 of the Agricultural Code, brought important changes in chapter 6 of division 15 of the code. (Opn. of Legislative Counsel, No. 12378, 3 Assem. J. (1968 Reg. Sess.) p. 4996.) The amended chapter 6 is entitled "Products Resembling Milk Products" in lieu of "Imitation Milk Products" and contains a comprehensive scheme of regulation of products "resembling milk products." Section 32512 defines "Milk Products" in great detail.

popular of the three toppings enjoyed sales in California in excess of one million dollars, and Coffee-Rich for the same period had sales approximating $600,000.

The trial resulted in a permanent injunction restraining defendants in substantial part, although not completely, from ". . . enforcing the provisions of statutes 1968, chapter 1250, with respect to the manufacture, importation, handling, distribution, sale or use . . ." in California of plaintiffs' named products.[2]

Plaintiffs appeal from several specific orders of the trial court interpreting and applying certain sections of chapter 6 but only to the extent that some of these interpretations are unfavorable to plaintiffs, and from finding (21) that the products, when not in containers, could be mistaken for milk products.

Defendants, dissatisfied with the court's interpretation of certain sections of the Agricultural Code, appeal from portions of the judgment (discussed *infra*) as well as from the finding (20) and resulting decree that when the products are packaged, they cannot be mistaken for milk products.

Amici curiae, the Dairymen's Task Force, and the Consumers Cooperative of Berkeley, Inc., have filed a brief supportive of defendants' position on some of the various issues at bench.

A detailed description of plaintiffs' products is set forth in footnote 3.

---

[2]The statutes under challenge, added by chapter 1250 of California Statutes, 1968, will be collectively referred to as chapter 6, which is the chapter in the Agricultural Code regulating products resembling milk products, enacted by chapter 1250. (See fn. 1, *supra*.) All references in the text are to the sections of the Agricultural Code, unless otherwise noted.

[3]The trial court made the following findings:

"6. Coffee-Rich is manufactured by Coffee-Rich, Inc., which is the owner of the trademark and trade name of "Coffee-Rich." Coffee-Rich, Inc. manufactures Coffee-Rich in the State of New York and sells it in interstate commerce to wholesale food distributors in California, and in the case of certain of the large grocery chains, Coffee-Rich is sold directly to the retailers in California. The wholesale distributors in turn sell Coffee-Rich to institutions such as restaurants, hospitals, schools and vending machine operators and to retail outlets.

"Coffee-Rich is sold only in hard-frozen form, except for some Coffee-Rich which is sold to institutions in powdered form. Coffee-Rich is sold by retail stores only in hard-frozen form.

"7. Coffee-Rich is a non-dairy coffee whitening agent which serves the same functions that are served by milk products and other food products as an additive to coffee, tea or other hot beverages to whiten and cool them, and also to be used on cereals and fruit and in cooking, and is so advertised by plaintiff, Coffee-Rich, Inc.

"8. Rich Products Corporation is the owner of the trademarks and trade names "Rich's Whip Topping," "Spoon n' Serve" and "Sundi-Whip" (hereinafter referred to as Rich Toppings) and of the United States Letters Patent under which the products are manufactured. Coffee-Rich is a developmental outgrowth of the subject of these

As the parties correctly point out the right to supervise the disposition of plaintiffs' products in this state must rest on section 38912 of chapter 6 which reads: " 'Products resembling milk products' means any food product for human consumption, except those referred to in Section 38903, which has the appearance, taste, smell, texture or color of a milk product and which, taken as a whole, bears resemblance to a milk product, or could be mistaken for a milk product."

Chapter 6, predicated as it is on section 38912, constitutes an exercise of police power.

Emphatic approval of the exercise by a state of this power to regulate specifically milk products and resembling products was announced 78 years ago by the Supreme Court of the United States:

"If there be any subject over which it would seem the states ought to have plenary control, and the power to legislate in respect to which it ought not to be supposed was intended to be surrendered to the general government, it is the protection of the people against fraud and deception in the sale of food products." (*Plumley* v. *Massachusetts,* 155 U.S. 461, 472 [39 L.Ed. 223, 227, 15 S.Ct. 154].) See *Florida Avocado Growers* v. *Paul,* 373 U.S. 132, 143-146 [10 L.Ed.2d 248, 259, 83 S.Ct. 1210], (California regulations affecting imported avocados upheld).

Regulation of a food product "which resembles milk" was held to be a proper exercise of such power by our Supreme Court. (*In re Reineger,* 184 Cal. 97 [193 P. 81].) The court said at page 104: "The proposition that a compound of this kind which is not milk, but which resembles milk, and which for many purposes may be used as a substitute for milk, is subject

---

patents. Rich Products Corporation manufactures the Rich Toppings named above in the State of New York and sells them in interstate commerce to wholesale food distributors in California. Wholesale distributors in turn sell Rich Toppings to retail outlets and to institutions such as restaurants, hospitals, schools, prisons, vending machine operators, etc. In the case of certain of the large grocery chains, the Rich Toppings are sold directly to the retailers in California. Rich Toppings are sold in frozen form.

"9. Rich's Whip Topping is a hard-frozen manufactured vegetable whipping emulsion which is sold to the public at retail in aerosol or pressurized cans. The topping, after thawing, is emitted in aerated form for use as a whipping topping and filler for pies, cakes, puddings, desserts, beverages and other foods. Rich's Whip Topping is also sold for institutional use in non-pressurized containers which, after thawing, is mechanically beaten or whipped into a topping for such foods. Sundi-Whip is the same product as Rich's Whip Topping and is sold by Rich Products Corporation to the institutional trade. Spoon n' Serve is a frozen pre-aerated vegetable whipped topping from the container onto the food or beverage. Spoon n' Serve is a non-dairy topping for pies, cakes, puddings, desserts, beverages, and other foods. It is also used as a filler for pies, cakes, puddings, desserts and other foods."

to reasonable regulations under the police power, designed to prevent it from being sold to consumers as real milk, is settled by the decision of the Supreme Court of the United States in *Hebe Co.* v. *Shaw,* 248 U.S. 297 . . . ." The findings listed in footnote 3 (*supra*) leave no doubt that plaintiffs' products are "for many purposes . . . used as a substitute for milk."

■ Such resembling products are not merely subject to appropriate intra-state regulation. They may be prohibited from interstate commerce (*U.S.* v. *Carolene Products* Co., 304 U.S. 144, 148 [82 L.Ed. 1234, 1239, 58 S.Ct. 778]), even when, in terms of nutrition, such products are at least as good as the milk product they resemble. (*Carolene Products Co.* v. *U. S.,* 323 U.S. 18, 21-25 [89 L.Ed. 15, 18-21, 65 S.Ct. 1, 155 A.L.R. 1371]; see also *Sage Stores Co.* v. *Kansas,* 323 U.S. 32, 34-36 [89 L.Ed. 25, 27-29, 65 S.Ct. 9].) Several recent decisions, although there is authority to the contrary, have upheld state statutes which prohibited rather than regulated products resembling milk products. (*Quality Food Products, Inc.* v. *Beard* (M.D.Ala. 1968) 286 F.Supp. 351, 353-355, 356-362 (prohibition of product which manufacturer intended to label 'imitation milk'); *Martin* v. *Wholesale Dairy, Inc.* (Tex.Civ.App.) 437 S.W.2d 586, 601-602 (prohibition of filled products in 'imitation or semblance' of a dairy product); *Reesman* v. *State,* 74 Wn.2d 646 [445 P.2d 1004, 1008-1010].)

The California Legislature specifically declares in chapter 6 (§ 38902) that its intent in enacting the legislation at bench was in the interest of public health, welfare and safety and the protection of the consumer from false and misleading marketing of products resembling milk products. It finds in section 38902, subdivision (a) that there is an increasing advent into the market-place of food products resembling milk products which are frequently mistaken for milk products, which have the same uses as milk products, and which are "frequently" manufactured and marketed in the same manner and the same places as milk products. The trial court's findings affirm these declarations of fact by the Legislature.

Aside from a plea of res judicata, plaintiffs' specific legal attack on the judgment insofar as it is unfavorable to them is in two parts. The first is predicated on the argument that the findings of the trial court entitle them to a complete injunction against defendants and the second, if the first fails, is that certain sections of chapter 6 which affect the marketing of plaintiffs' products, are unconstitutional.

### FINDINGS DO NOT WARRANT AN INJUNCTION

■ Plaintiffs argue that findings 16 and 20 entitle them to a complete injunction. They point out that the trial court in its finding 16 held "When

compared to and alongside of milk products, plaintiffs' products have distinctive differences in appearance, taste, odor, color and texture." And in its finding 20 it held that "when plaintiffs' products are sold in the original labeled package (or, in the case of 'Coffee-Rich,' when in powdered form), the products do not bear resemblance to any milk product nor could they be mistaken for any milk product." Predicated upon findings 16 and 20, they argue that these pertinent findings should compel a judgment excluding their products from regulations under chapter 6.

Finding 21, however, recites as fact that "When plaintiffs' products are served to the consumer . . . not in labeled containers which identify the product as a non-dairy product, each of said products, taken as a whole, *could be mistaken for milk products, and are subject to the Act.*" (Italics added.)

We proceed to an analysis of the findings in question.

■ At the outset, it must be noted that we treat, as do plaintiffs, 16 and 20 as findings of fact. Because finding 21 uses statutory language to state the ultimate facts found, plaintiffs insist that finding 21 is actually a conclusion of law. A finding of ultimate facts in the words of the statute is sufficient. (*So. Cal. Jockey Club* v. *Cal. etc. Racing Bd.,* 36 Cal.2d 167, 177-178 [223 P.2d 1]; *Lumbermen's Mut. Cas. Co.* v. *Ind. Acc. Com.,* 29 Cal.2d 492, 498 [175 P.2d 823], and cases cited therein; *Goss* v. *Fanoe,* 114 Cal.App.2d 819, 823 [251 P.2d 337].) Findings 16, 20 and 21 all use statutory language. Obviously, plaintiffs cannot have it both ways. We treat all three as findings of fact (text *infra*).

Findings 16 and 20 do not satisfy section 38912 which all litigants concede to be the key statute and they are inconsistent with finding 21.

■ Section 38912 does not say that the *test* of ". . . resembling milk products" is to be made " . . . alongside of milk products . . ."

It is logical to assume that the ordinary consumer, when comparing "milk products" which are "alongside" of resembling products, would be far less likely to be mistaken as to which was which than if the two types of products were not "alongside." The Legislature, when it enacted chapter 6 and specifically section 38912, did not intend to subject the public to a shell game. The assumption that every time a consumer is about to use a product resembling a milk product, there is provided for his inspection and/or use a milk product which he can see and simultaneously taste and smell, is contrary to all business practice and is one which is not warranted by any of the facts of record and substitutes a different test than that found in section 38912. Finding 16 is a far narrower test than that envisaged by the

Legislature. A test so engrafted upon and not warranted by chapter 6 is outside the issues and must be disregarded. (*Crescent Lumber Co.* v. *Larson,* 166 Cal. 168, 171 [135 P. 502].) The engrafted test is in direct conflict with finding 21 that the consumer could mistake plaintiffs' products for milk products, when served to him in a non-labeled container. A conflict between material findings, taken alone, mandates a reversal of the judgment. (*Learned* v. *Castle,* 78 Cal. 454, 460 [18 P. 872, 21 P. 11]; *Stiefel* v. *McKee,* 1 Cal.App.3d 263, 266 [81 Cal.Rptr. 565].)

Finding 20 asserting that plaintiffs' products *when* packaged, " . . . do not bear resemblance to any milk product nor could they be mistaken . . ." means no more than what it specifically says. This finding says only that when the consumer sees the packaged product labeled "non-milk product" he should not reasonably be mistaken that it is a "milk product." It is, however, not even equivalent to a finding that plaintiffs have complied with the labeling and advertising provisions of chapter 6.[4] It is not a finding that the *contents* of the package are not embraced within the definition of section 38912, to wit: a product resembling milk, and the language of the section does not warrant such a construction.

The net effect of findings 16, 20 and 21 is that if a consumer were served with one of plaintiffs' products alongside a milk product, he could tell the difference; if sold in a packaged form, the consumer should not be deceived, but if served unpackaged, the consumer could be deceived and mistake plaintiffs' products for milk products.[5] However, chapter 6, to borrow a phrase, makes it "perfectly clear" that the Legislature did not intend to abdicate its power to police the content of a product "resembling milk," or its power to reasonably provide what the label on the package should tell the public, merely because it is sold in a package which identifies it as a non-milk product.

Counsel at trial admitted that in a "restaurant context" the consumer could justifiably be confused as between milk products and Coffee-Rich which, when sold in a restaurant, is in appearance, etc. the same Coffee-

---

[4]See footnote 15, *infra.*

[5]The verbose and complex record in this case contains a clue to the misconception of the scope and sweep of chapter 6. The Chief of the Bureau of Dairy Service of the Department of Agriculture, one of the named defendants, when called as an adverse witness by plaintiffs, testified that from the point of view of enforcing chapter 6 the "primary consideration" in the sale of resembling products was the *place of sale,* namely restaurant or grocery store. In a place such as a restaurant, the witness emphasized, the sale is made without benefit of packaging, and is served in an unlabeled container to the patron. In a grocery store, the consumer may read the labeling on the package and be informed accordingly.

Rich which is sold in packages.[6] Plaintiffs' explanation of this obvious breach of section 38912 was that while the consumer could be confused in such a context, he was not deceived since the "public doesn't really care as long as this type of product is satisfactory for the specific need or use to which they are putting them." Very extensive opinion researches were introduced at trial to buttress this claim. We accept the opinion researches but such acceptance does not divorce plaintiffs from regulation under the state's police power and the trial court found it did not (finding 21). Counsel, of course, was focusing on the phrase of section 38902, subdivision (b) which states that the Legislature intended to prevent "deception *and* confusion." Aside from the fact that one may or may not care about being deceived, and still be deceived, it is clear that the Janus-like findings at bench are not supported by the record and were inspired by the mistaken approaches of counsel and the emphatic views of witnesses. Thus, to decree that the packaged product is not subject to regulation inverts the statutory pyramid by effectively allowing any substance, pure or impure, healthful or not, to be marketed, as long as it was in a "properly" labeled and honestly[7] advertised container.

The fallacy of such a conclusion appears when it is applied by analogy

---

[6]"MR. LEVITAS [plaintiffs' counsel]: . . . there are some patrons who use a creamer in their coffee who think they are receiving cream when, in fact, they are receiving a non-dairy product.

"There are some who think they are receiving cream when they are receiving either milk, half-and-half, evaporated milk, condensed milk, or some combination of them.

"There are people who believe they are receiving a non-dairy product when in fact they are receiving either cream or half-and-half or condensed milk or some combination.

". . . . . . . . . . . . . . .

"We would go that far in saying that we believe that people are getting things for use in their coffee in restaurants which is different from what they think they are getting.

"Now, that is our stipulation. Our contention is, your Honor, that there is a great degree of confusion as far as this matter is concerned, but that basically the public doesn't really care as long as this type of product is satisfactory for the specific need or use to which they are putting them."

[7]Packaging of milk and milk products is but one of the numerous standards and requirements for their production, processing and sale, set forth in division 15 of the Agricultural Code. (See fn. 11, *infra.*)

The labeling on plaintiffs' packaging denotes that it contains no "milk fat." However, there is a complete omission of any mention that it does contain fat inherent in coconut oil. Such omission can, to use but one illustration, undoubtedly mislead a calorie conscious consumer. (See finding 32 and Regulation 471b *infra.*)

Also, article 3 of chapter 6 establishes the standards for an imitation milk product with great specificity as to chemical and physical composition (§ 38912), its nature as a trade product (§ 38922), purity standards (§ 38923) and levels of healthfulness (§ 38924). These sections would be futile legislation if mere compliance with sections on labeling and advertising would suffice to eliminate all other supervision.

to genuine milk products, and milk itself: it can hardly be contended that regulation of milk should be confined to its container, and that any substandard milk could be sold, as long as it was in a proper container. Our Supreme Court concluded over half a century ago that products *resembling* milk are subject to a reasonable regulation under the police power (*In re Reineger,* 184 Cal. 94, 104 [193 P. 81]) and it is clear that any such regulation would be utterly self-defeating if it ignores the contents of the package.

■ Plaintiffs argue further that sales of their products to institutions (such as restaurants) and service thereof by institutions cannot be enjoined because finding 21 is defective in that it recites only that plaintiffs' products ". . . taken as a whole, could be mistaken for milk products, and are subject to the Act." Finding 21, plaintiffs argue, is defective because section 38912 mandates a finding of the conjunctive requirements: that the resembling product has "the appearance, taste, smell, texture or color of a milk product *and* which, taken as a whole, bears resemblance to a milk product, or could be mistaken for a milk product."

However, it is difficult to understand how a consumer could mistake a resembling product for a milk product if it did not have one or more of the five specifics outlined in section 38912. It would appear to us that the language used by the trial court "could be mistaken for milk products" followed by the fortifying words "and are subject to the Act" leave no doubt that at least one, if not all of the five specifics are implicitly included in the finding.

The findings and conclusions made impel this construction.

In addition, the record leaves no doubt as to the likelihood of public deception. (See fn. 6, *supra.*) ■ And finally, under familiar appellate rules, this court is bound to construe findings and the judgment predicated thereon with all logical inferences in favor of such findings if their language and the record permits. (*Denham* v. *Superior Court,* 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *Johnston* v. *Southern Pac. Co.,* 150 Cal. 535, 537 [89 P. 348].)

RES JUDICATA

■ Plaintiffs assert res judicata binds this court to the result reached in *Aeration Processes, Inc.* v. *Jacobsen,* 184 Cal.App.2d 836 [8 Cal.Rptr. 85], respecting one of the four products which are subject to the litigation at bench, namely "Rich's Whip Topping." (It was Rich's Whip Topping which registered sales in excess of one million dollars in a two-and-a-half-year

period.) In *Aeration* plaintiff-manufacturers of a product called "Instant-whip Topping" invoked, as do plaintiffs at bench, Los Angeles Superior Court cases No. 521006 and 597020 (B. C. Whelan v. A. A. Brock, Director of Agriculture and Rich Products of California, Inc. v. A. A. Brock, Director of Agriculture, respectively) and *Midget Products, Inc.* v. *Jacobsen,* 140 Cal.App.2d 517 [295 P.2d 542], in an effort to show that the issue of "imitation milk products" had been finally adjudicated in these earlier cases, and that renewed consideration was therefore barred. The *Aeration*-Whelan-Rich-*Midget* line of decisions held that the products were not "imitation cream" or "imitation milk products" as those terms were defined in the then relevant sections of the Agricultural Code. Plaintiffs contend that "Rich's Whip Topping" is identical to the products which were the subjects of the four cited cases.

Recognizing that the definition of "imitation milk" of the now-defunct section 651[8] of the Agricultural Code cannot be determinative of an appeal to be disposed of in terms of section 38912 of the present code, plaintiffs contend that the definition actually applied in *Aeration* is in substance indistinguishable from that of section 38912. The court did hold in that case that "imitation"[9] was a matter decided by taste, smell, texture, consistency, melting points and use, and the composite effect of all of them. (184 Cal. App.2d at pp. 840-841). At bench, however, the trial court expressly found that "Rich's Whip Topping," sold under that name at the time of the Whelan and Rich superior court cases (1946-1947 and 1953, respectively), differed from the "Rich's Whip Topping" in this case both in ingredients and color.

Assuming arguendo that the *Aeration* definition and section 38912 are identical, the change in ingredients is such a change in facts as will prevent the application of the doctrine of res judicata. (*McGaffey* v. *Sudowitz,* 189 Cal.App.2d 215, 218 [10 Cal.Rptr. 862].)

Aside from the vital and substantial differences in fact and in statute between the *Aeration* line of cases and those at bench, it is worth noting that notwithstanding these decisive distinctions, the court in *Aeration* anticipated the difference between the statute then under construction (§ 651), and the concept now contained in section 38912. In *Aeration,* although the court recognized that Rich's Instant Whip Topping *resembled* a milk product, it held that the statute then in effect, to wit: section 651, was predicated

---

[8]Section 651 defined an "imitation milk product" as any substance mixture or compound other than milk or milk products, intended for human food, made in imitation of, or having the appearance or semblance of, milk or any product thereof.

[9]See footnote 10, *infra.*

upon *imitation,* and went on to say that ". . . semblance or appearance . . . are not sufficient . . . to constitute imitation." Section 38912 obviously does and was intended to enlarge the definition of the *Aeration* decision dealing with "imitation milk." The declarations of several legislators contained in the record demonstrate that this change in definition was not inadvertent and that section 38912 was drafted to *avoid* the definitional holdings of *Aeration* and *Midget.* In sum, *both* the law and the facts have changed. Under such circumstances, res judicata does not apply. (*Bernhard* v. *Bank of America,* 19 Cal.2d 807, 813 [122 P.2d 822].)[10]

### THE CONSTITUTIONALITY OF CHAPTER 6

Plaintiffs question the constitutionality of sections 38903, subdivision (e), 38904, 35191, 38941, 38952, 38954, 38956, 61390, 38905 and section 471, subdivision (b) of the department's regulations.

The attack on each section, justified in some instances, will be generally treated in the order outlined above.

It should be made clear at the outset that the record indicates that plaintiffs' products, as they have been and are now constituted, are nutritious and wholesome and are in all particulars fit and acceptable for human consumption. Certainly the same can be said for milk and milk products.

The general and underlying thrust of plaintiffs' attack on the entirety of chapter 6 is that it has been enacted in the interests of California's dairy industry and to protect it from competition. They point to the lower cost of their products and to the general nutritional advantages of their products over milk. It should be therefore made clear at the outset that the state's Agricultural Code does not focus upon or single out specifically plaintiffs' products. All milk, milk products and products "resembling milk" products, produced and marketed in this state are governed by numerous, detailed and rigorous statutes and regulations in respect of every facet of production and marketing.[11] Nothing in the language of the Agri-

---

[10]Section 651 spoke of an "imitation milk product" as one made "in imitation of" *or* "having the appearance or semblance of" a milk product. (Fn. 8, *supra.*) As noted in the text, the *Aeration* decision rejected, perhaps incorrectly, the alternative wording indicated and dismissed "mere" semblance or appearance as insufficient to bring the product within section 651. *Aeration* is sound to the extent that it holds "semblance" or resemblance to be a wider concept than imitation. (See *Coffee-Rich, Inc.* v. *Commissioner of Public Health,* 348 Mass. 414 [204 N.E.2d 281, 285].) The correctness of the holding therein exempting the product discussed from the now-superseded section 651 is not before this court.

[11]The Milk and Milk Products Act of 1947, contained in division 15 of the Agricultural Code, is set forth in sections 32501-39524 of that code. A mere glance at

cultural Code or specifically chapter 6 is directed against out-of-state competition or for that matter to any particular in-state manufacturer of resembling products. Insofar as chapter 6 may be constitutionally unfair to plaintiffs' products, and in some particulars it is (discussion *infra*), it is also constitutionally unfair to in-state products resembling milk. ■ Considerations of a social or economic nature which may or may not underlie the legislation at bench are not within the province of this court to determine or, following the extensive legislative action in this area, to redetermine. (*Bodinson Mfg. Co.* v. *California E. Com.*, 17 Cal.2d 321, 325 [109 P.2d 935]; *Estate of Horman*, 5 Cal.3d 62, 77 [95 Cal.Rptr. 433, 485 P.2d 785].)

■ A statute governing imitation milk first went into effect in California on July 22, 1919. (Stats. 1919, p. 89.) This legislation appears to have been enacted in response to the first "filled" and "imitation" milks which came on the market in bulk around 1916. ("Substitute Milk," Consumer Reports, January 10, 1969.) In many of its aspects, the 1919 legislation resembled chapter 6 and it came before our Supreme Court in *In re Reineger*, 184 Cal. 94 [193 P. 81], in 1920. In that case the court, as pointed out *supra*, held, that resembling products are subject to reasonable regulations under the police power.

We note plaintiffs' citation of decisions from other jurisdictions which exempted Coffee-Rich from their particular imitation milk statutes. Of course, we interpret here neither the laws of other states nor our own superseded milk legislation. We recognize, too, that there are specific provisions in the Health and Safety Code dealing with foods. (Health & Saf. Code, § 26000 et seq.) Nevertheless, the Sherman Food, Drug and Cosmetic Law to which plaintiffs inferentially refer, also contains an express injunction that its provisions are to be construed so as not to be in conflict (Health & Saf. Code, § 26052) with related provisions of the Agricultural Code. Sec-

some of the section headings indicates the detailed nature of the statutes: chapter 9 of part 1 ("Weighing, Measuring, and Testing of Milk and Basis for Payment") extends inter alia to "Milk Fat Tests," "Nonfat Milk Solid Tests," and "Equipment"; the following chapter on Containers sets forth regulations on "Brand Registration," "Branded Containers," "Containers for Particular Products," "Sanitation," and the like; chapter 2 of part 2 details in *15 separate articles* standards for market milk and cream, regulating the precise bacterial count for the several types of milk, the required temperatures and other physical characteristics, the health standards of the producing livestock and the handlers of the milk, to name a few items. The Attorney General has attempted to highlight some of these regulations by listing some of the sections of the Milk and Milk Products Act of 1947, and that highly selective list extends to six pages in the respondent's brief. It is indeed impractical to condense several hundred pages of statutory, and the hundreds of pages of administrative, regulations with which the California milk producer has learned to live.

tion 38906 in turn provides unequivocally that in the event of a conflict between chapter 6 and the Health and Safety Code, the former must prevail. ■ Chapter 6 therefore is the Legislature's judgment that products resembling milk products should be regulated by specific enactments in addition to the Sherman Food, Drug and Cosmetic Laws therein contained. When we note the extensive and detailed regulation of the dairy industry itself by laws other than the Sherman Law (fn. 11, *supra*), the Legislature's judgment as written into section 38906 appears to be neither unfair nor capricious. Finally, when the Legislature's judgment is tested by the evidence spread over 2,000 pages of reporter's transcript as to the particular potentialities of these resembling products, that judgment is vindicated by demonstration. On the overriding constitutional issue we are guided by, and defer to, the California Supreme Court. (*In re Reineger, supra,* 184 Cal. 94.)

*Hermetic Sealing.*

■ Section 38903, subdivision (e) exempts from the embrace of chapter 6 *any* milk-resembling product subjected to a temperature high enough to achieve sterilization and packaged in a hermetically sealed container. The trial court having examined liquid Coffee-Rich and other products meeting the requirements of section 38903, subdivision (e) which have uses similar to liquid Coffee-Rich, found the latter products were "indistinguishable." Plaintiffs therefore contend that there is no reasonable basis for differentiating between Coffee-Rich and its (sterilized and hermetically sealed) competitors.

The trial court found as to section 38903, subdivision (e): ". . . the Legislature had a reasonable basis for concluding that food products which are hermetically sealed and in a sterile condition would be less susceptible to the growth of microorganisms than food products which are not sterile or hermetically sealed, and therefore had a valid reason for establishing the exemption defined by that subdivision."

■ "A classification is reasonable, . . . only if there are differences between classes and the differences are reasonably related to the purposes of the statute." (*Werner* v. *Southern Cal. etc. Newspapers,* 35 Cal.2d 121, 131 [216 P.2d 825, 13 A.L.R.2d 252].) One of the purposes of chapter 6 is the protection of public health. (§ 38902, subd. (b).) Plaintiffs cite evidence which shows that hermetically sealed products cease to be sterile when the seals are broken whereas liquid Coffee-Rich, *as long as it remains in a frozen state,* is free from harmful bacteria and organisms. The gist of plaintiffs' position on this issue at trial was that freezing a product is preferable to the sterilization and hermetical sealing required by section

38903, subdivision (e) since the latter form of preservation is susceptible to casual damage (piercing, breaking) whereas the former is not exposed to such fortuities. However, a sterilized product heremetically sealed is no longer hermetically sealed or sterilized when the seal is broken. Thus, plaintiffs seek to establish an unreasonable discrimination by emasculating the standard of comparison.[12] The exception of sterilized and hermetically sealed products does not appear in the statutory precursor to section 38903, section 38986. It is an extension of the exception granted by former section 38986 (now contained in § 38903, subdivision (b)).

 The Legislature, with the health of the public in mind, concluded that hermetic sealing, and sterilization, of products resembling milk products, was to promote and protect the public's health. Hermetic sealing is available to plaintiffs.[13] If freezing is a similar and acceptable mode of

---

[12]Plaintiffs attempted to establish by vigorous cross-examination of defendants' experts that hermetically sealed products are susceptible to contamination. Plaintiffs' failure on this issue is illustrated by the following exchange:

"Q. BY MR. LEVITAS: Hermetically sealed cans, for example, could be punctured or damaged in similar ways to bags, is that correct? A. To a lesser extent, yes. Q. You have seen hermetically sealed cans which have been punctured, have you not? A. Yes. Q. By the way, referring to Plaintiffs' Exhibit 10, do you know whether or not that's a foil-lined bag? A. I have never seen this kind of package before. I don't—I would have to open it to find out. Q. So far as you know, that bag could either be foil lined or not? A. Right. Q. Can a hermetically sealed sterile product such as Praise have bacteriological deterioration while it is canned? A. Yes, if the contaminant had gained access to it during packaging or through damage during distribution. Q. Now, assume that there was no access during packaging and let's assume it is free from further harm to the can, do the type of bacteria normally found in a standard plate count penetrate through seams or linkages in the can? A. Not unless they are broken. Q. And therefore, assuming there were no—no break in the can, the product should be substantially—in the substantially same bacteriological condition that it was in when it was packaged, is that correct? A. Bacteriologically, if it were—if it were sterile when it was placed in."

[13]THE COURT: Yes. Taking a small phase of the matter, the hermetically sealed matter still bothers me. It does seem to me there is a valid distinction between the hermetically sealed and the nonhermetically sealed and, as I stated during the trial, if you recall, I said why doesn't the plaintiff avoid this problem by putting their products in such a container. You may or may not recall.

"MR. LEVITAS: [plaintiffs' counsel] I remember the Court asked twice, if I remember correctly. THE COURT: Yes. Why not get in the same category as Carnation? I didn't see any mechanical or expense matter involved. MR. LEVITAS: The only purpose that would be served by doing that would be avoiding the application of the statute, avoiding regulation. THE COURT: Isn't that a purpose—you are in business to make money. You are not proving any principle here. MR. LEVITAS: People don't usually litigate for that purpose. There is a principle at stake. THE COURT: Yes, there is a principle at stake. In that sense it seems like almost the blind anger of the bull in the arena."

At oral argument, however, plaintiffs' counsel contended that considerations of cost militate against plaintiffs turning to hermetic sealing. Viewed to its best advantage, the record on this question is far too inadequate to bring this question within the purview of this or any court.

preserving resembling milk products, the matter should be presented to the Legislature. Nothing indicates that the benefits of freezing vis-à-vis sterilization and hermetical sealing was presented to the Legislature prior to the 1968 enactment of chapter 6 or at any other time. Legislative committees are empowered and are undoubtedly interested in ascertaining the relative merits of each, not alone on testimony of experts on the subject (which is all this court has) but such committees have the means and the responsibility to make complete and competent investigation. In the absence of evidence of any arbitrary action by the Legislature on this facet of the subject we feel that this court should not in the first instance assume the duties of investigation and fact finding imposed on a legislative committee and in the final analysis, upon the Legislature itself. "[U]nder the doctrine of separation of powers neither the trial nor appellate courts are authorized to 'review' legislative determinations." (*Lockard* v. *City of Los Angeles*, 33 Cal.2d 453, 460 [202 P.2d 38, 7 A.L.R.2d 990], cited in *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind*, 67 Cal.2d 536, 545 [63 Cal.Rptr. 21, 432 P.2d 717].) Further, there is no showing that plaintiffs are being unreasonably, economically or otherwise disadvantaged by this requirement. (See fn. 13, *supra.*) ▮ There must, however, not only be a showing of economic disadvantage for legislation to be invalidated on that ground: ". . . a state statute may not be struck down as offensive of equal protection in its schemes of classification unless it is *obviously* arbitrary . . . ." (Italics added.) (*McGowan* v. *Maryland*, 366 U.S. 420, 535 [6 L.Ed.2d 393, 461, 81 S.Ct. 1101], separate opinion by Frankfurter, J.) No such showing has been made either in the trial or this court.

*Charitable and Penal Institutions.*

▮ Section 38904 provides that no products resembling milk products shall be used in any penal institutions or in any of the charitable institutions that receive assistance from the state. The trial court found that there is no valid basis, either in the state Constitution or the police power of the state, to regulate, particularly by prohibition, the sale of a class of products to charitable institutions but found the restriction valid as to state penal institutions.[14]

The prohibition of section 38904 first appeared in imitation milk and milk products legislation in 1931. (Stats. 1931, p. 459.) The most recent

[14]The trial judge, in stating his view on this subject to counsel, remarked:

"When it comes to charitable institutions I could see no logical distinction for this requirement. I could see no sense to the requirement with charitable institutions [that] there be this limitation on the use of this. To me it is simply a matter of a lobbying effort without rational relationship to the end sought to be achieved."

We agree and would add that the same logic appears to apply to penal institutions.

precursor of section 38904 is former section 38902. No litigation or other background in respect of this section has been called to our attention. However, we note the somewhat unaccountable testimony of the regional manager of one of plaintiffs' that plaintiffs' products have been sold to Vacaville Hospital and Folsom Prison. The only argument made by the state to sustain the section is that: ". . . in exercising its paternal control over prisoners' and patients' diets, [ ] it should be permitted to select products which are known to satisfy nutritional needs."

The record is clear, however, that plaintiffs' resembling products are wholesome and nutritious and also show that whole milk is from a nutritional standpoint preferable only for infants and those who may require a specific type of medical care.

The state, in the exercise of its police power, has paternal responsibility to all of its residents to insure that food products of any kind consumed by the public are wholesome and in all respects proper for human consumption and that the public be adequately informed as to the nature of the product it is asked to purchase and consume. In the exercise of that responsibility and in aid of its desire to insure the public that products sold for human consumption will conform to laws and regulations, the state in a proper exercise of its police power must and should provide means of constant and continuous supervision. In its enactment of section 38903, subdivision (e) the Legislature specifically exempts from supervision under chapter 6 any milk-resembling product, sterilized and packaged in a hermetically sealed container, confident that it had fulfilled its responsibility to the public by that regulation.

Police power does not embrace the right to tell the public or any part of the public which of the products which do conform to the Agricultural Code the public may consume. Assuming, as section 38904 does, that resembling products do meet the requirements of the Agricultural Code, in the absence of any showing whatsoever justifying such a prohibition, it is arbitrary for the state to take the position that they may not be used in penal or charitable institutions. There is nothing to indicate that this provision is reasonably or in any way necessary to promote public health, safety or the general welfare of the community and it is therefore not a valid exercise of the state's police power. (*Miller* v. *Board of Public Works,* 195 Cal. 477, 484 [234 P. 381, 38 A.L.R. 1479]; *McClain* v. *City of South Pasadena,* 155 Cal.App.2d 423, 434-435 [318 P.2d 199].)

We hold section 38904 to be invalid and unconstitutional.

*Records*

Plaintiffs contend that section 35191 is in its entirety an un-

reasonable burden on interstate commerce (all of plaintiffs' products are manufactured outside of California) and that the trial court's construction amounts to an impermissible judicial reformation of the statute. (*Mulkey* v. *Reitman,* 64 Cal.2d 529, 544 [50 Cal.Rptr. 881, 413 P.2d 825].)

Section 35191 provides: "Every person that manufactures or imports any oleomargarine or margarine, or any substance designed as a substitute for butter, or that resembles butter, which is not made wholly from pure milk or cream, or any product resembling a milk product, shall keep a record, which gives the quantity that is sold or purchased, the name and location of the seller and purchaser, the date, and the place to which it was shipped or delivered."

Relative to this provision the trial court found:

"23. The provisions of the Act which require the manufacturer or importer of any 'product resembling a milk product' to keep a record giving the quantity that is sold or purchased, and the name and location of the seller and purchaser, and the date and place to which it was shipped or delivered, shall apply only to a sale to a purchaser of the product upon a wholesale basis, or to a purchaser for resale to others or to any direct sales by the manufacturer to institutions; and so far as the law applies or purports to apply to sales to consumers at retail, it is an unreasonable burden upon commerce and a denial of equal protection of the laws and an improper and excessive exercise of the police power."

Defendants point out that: "The purpose of the record-keeping requirement is to enable the distribution of a particular product to be traced. Thus, upon discovery of contamination, for example, distribution to ultimate consumers may be curtailed or perhaps entirely prevented with the assistance of the records required to be kept by importers and manufacturers." This argument commends itself to common sense and the promotion of public health. It is incorrect to claim that plaintiffs have been singled out for particularly onerous record keeping. One glance at section 61441 shows that the distributors and manufacturers of milk, cream and dairy products are held to far more extensive reporting requirements than those importing or manufacturing resembling products. Although the quoted finding expressly limits section 35191 to wholesalers, it seems to us that the limitation expressed in the finding is inherently implicit in the statute. The phrase "Every person that *manufactures* or *imports* . . . " (italics added) (§ 35191) cannot reasonably include one who buys retail. The rule *noscitur a sociis* permits the meaning of a word to be enlarged or limited by reference to the object of the clause in which it is used (*People* v. *Stout,* 18 Cal.App.3d 172, 177 [95 Cal.Rptr. 593]). The

use of the word "imports" in section 35191 was not intended to apply to an individual making a retail purchase in another state. The court's finding purporting to "sever" retail purchases from section 35191, we deem to be unnecessary. We hold that section 35191 was intended to apply only to those who manufacture or import for resale to retail outlets.

*Registration.*

 Section 38941 requires that any person engaged in the manufacture of resembling milk products shall register the products with the department. This requirement, plaintiffs say, unfairly singles them out as the dairy industry is not so regulated and the only other product which must be registered under the Agricultural Code is economic poison.

Registration is accomplished on a form supplied by the department which requires that applicant list the ingredients of the product as well as the proposed label. The director of the department is required to grant the registration if the product complies with chapter 6. (§ 38942.) Only registered products may be sold. (§ 38944.) The bewildering variety of resembling products which an enterprising and imaginative industry can bring on the market, impels the conclusion that this regulation is sound if for no reason other than it serves the obvious purpose of detecting a dangerous product before it can reach the consumer. The fee—$5—is minimal. Listing of ingredients and labeling of the product can surely be accomplished without impeding the flow of commerce. The registration requirements for "resembling" products are simple compared to the myriad regulations imposed on the dairy industry, and are a practical and hopefully a salutary first step to ensure enforcement of chapter 6.

We find section 38941 to be a constitutional exercise of police power.

*Labels.*

 Plaintiffs question section 471(b) of the regulations of the department which requires that labels of trade products which resemble milk products contain the source of the oils or fats in descending order of predominance, and that if an oil or fat has been hydrogenated, that that fact shall be stated. In its finding 32 the trial court held ". . . such regulation is a valid exercise of the police power since the public has a right to know the nature of the food products it consumes, and section 471(b) promotes one or more of the Legislature's stated purposes of the Act, and is authorized by sections 38902(b) and 38952 of the Act, if the Director determines the same to be in the public interest."

The regulation under attack (§ 471(b) of tit. 3 of the Cal. Admin. Code) provides as follows:

"The term 'filled product' or 'non-dairy product' shall be followed by a list of ingredients in the descending order of predominance in a type at least one half as large as the term 'filled product' or 'non-dairy products,' as the case may be. The source of the oil or fat shall be identified and if a blend, the source of the oils or fats shall be listed in descending order of predominance. If the oil or fat has been hydrogenated, the fact shall be stated."

Plaintiffs contend that there is no "constitutional basis" for section 471(b) in that section 38953, governing the labels of imitation milk products, makes specific reference to the "source of the oil other than milk fat" whereas section 38952 (labels on resembling products) makes no mention of the source of the oil or fat contained in products resembling milk products.[15] Plaintiffs reason that even though, under both sections, the director of the department has authority to require information on the labels which he determines to be in the public interest, the failure of the Legislature to mandate a specific type of source-information in 38952 (resembling products) discloses its intent to exclude such a statement from labels of resembling products. Issue is joined on the question whether fats and oils used in resembling products differ in nutritional and health aspects from milk fats. Testimony was marshalled by the litigants on this latter question. Although plaintiffs now argue that the types of oils used in their products are virtually the same, and that a description of their source is therefore meaningless, their leading expert, Dr. George V. Mann of the Vanderbilt University School of Medicine, testified in great detail about the advantages of coconut oil. Since plaintiffs have made their case on the merits of coconut oil to the scientific community and to the public, nothing but good can come

[15]Section 38952: "Each container which contains a product resembling a milk product, other than an imitation milk product, shall be labeled with the name and address of the manufacturer or distributor, and the names of the ingredients contained in such product. Such product shall be labeled with a fanciful or brand name only, but the list of ingredients of a filled product shall contain the statement that the product is a 'filled product,' and the list of ingredients of a nondairy product shall contain the statement that the product is a nondairy product. Such information shall appear conspicuously upon the label of the container, in a manner established by the director through regulation. In addition, the director may, by regulation, require any other information to be included on the label which the director determines to be in the public interest. [Added by Stats. 1968, ch. 1250, § 20.]"

Section 38953 provides: "An imitation milk product shall be labeled 'imitation' followed by the name of the milk product imitated. For example, an imitation milk product having the appearance and semblance of milk shall be labeled 'imitation milk.' No ingredient listing, other than the source of the oil or fat other than milk fat, is required on the container of an imitation milk product. There shall be included on the label of an imitation milk product the name and address of the manufacturer or distributor, and any other informaiton which the director, by regulation, determines to be in the public interest. [Added by Stats. 1968, ch. 1250, § 21.]"

of the director's regulation that they proclaim that fact on their labels. If coconut, palm kernel, and babassu oils have, as another of plaintiffs' experts stated, ". . . virtually the same kinds of fatty acids in very much the same proportions" the public would only commend plaintiffs for their use. However, the fact cannot be contested that there are other oils which may be less excellent perhaps than coconut oil or babassu and the director's regulation that that fact, too, be made known, if it arises, can only benefit those who chose to consume the better oil, to wit: the public. Since "imitation milk" is statutorily defined in terms of oils or fats other than milk fat, used in combination with a milk product (§ 38914), there is, of course, no other foreign ingredient to identify, and the legislative "intent" in making the specific proviso as to source-identification in section 38953 (labeling of imitation milk) and omitting it in section 38952 is amply explained.

 Plaintiffs separately attack section 38952 (fn. 15, *supra.*) The trial court found:

"28. Section 38952 requires that labels may show fanciful or brand names only and prohibits a generic description of the product. No food product, other than those described in Chapter 1250, is subject to such limitation; labels of all other foods are required under California law and all foods under federal law to state the common or ordinary name of the product, if any. Said requirement and said section are invalid, in that it has no reasonable relationship to the health or welfare and separately requires a violation of federal statutes and regulations thereunder."

The federal law referred to in finding 28 is 21 United States Code section 343 (i) which requires that a product be labeled "with the common or usual name of the food." Plaintiffs contend that they cannot comply with the federal law, and use a "common or usual name," and at the same time use the "fanciful or brand name" required by section 38952 and they also argue that section 38952 impinges on their freedom of speech since it "suppresses the truth" about their products.

Both arguments are predicated on the unarticulated assumption that plaintiffs' products are, for want of a better generic term, "natural" foods. They are, of course, manufactured from many components in a lengthy process. They are "artificial" foods (which in and of itself does not detract from their value) and they are relatively new to a man's diet. 21 United States Code section 343 (i) requires the common or usual name of a food "if any there be." Milk, apples and potatoes have common names, but what can the common name of a manufactured food be? One might suggest that such a common name is, in the instance of a filled product (§ 38913), "filled product" (*see* "Substitute Milk," *supra,* Consumer's Reports, January

10, 1969), and for want of any better terms, "nondairy product" for those resembling milk products. (§ 38915). Section 38952 does not require that resembling products be labeled only "nondairy products" but makes allowance for brand names, as well. The common or usual name of a relatively new artificial or fabricated food must be, as a logical matter, a "fanciful" or "brand" name—unless plaintiffs intend to label their products "milk" or "cream" which under no circumstances is a common or usual (nor an honest) name for a product that is neither milk nor cream and contains not a particle of either. The federal law cited in finding 28 does not conflict with section 38952. Section 38952 requires plaintiffs only to tell the truth, a matter of which they cannot validly complain. (*Paraco, Inc.* v. *Dept. of Agriculture,* 118 Cal.App.2d 348, 354 [257 P.2d 981].) Finally, plaintiffs' argument that section 38952 strips them of the use of their trademark property in "Coffee-Rich" and "Rich's Whip Topping" is not an argument. It is a mistaken assumption. The established statutory generic name of plaintiffs' products is "nondairy product." Coffee-Rich and the names of the associated products of the respective plaintiffs involved at bench are sufficiently fanciful, or clearly enough brand names, to be permissible under section 38952.

We hold section 38952 to be constitutional, and section 471(b) of the department's regulations to be a proper exercise of the power of the department.

■ Plaintiffs attack sections 38956 and 38954 as vague, uncertain and ambiguous.

Section 38956: "Trade products containers and labels shall not contain any combination of words, symbols, marks, designs, or representations commonly used or associated with the sale, advertising, or distribution of milk products. The labels shall not contain statements regarding milk products except those permitted by Section 38954 and any necessary factual statement regarding any ingredient milk products. [Added by Stats. 1968, ch. 1250, § 21.]"

Section 38954: "Labels of products resembling milk products may contain references and comparisons of products with milk products as long as such statements are reasonable, relevant, truthful, complete, and not deceptive or misleading. The director may require satisfactory proof of the compliance of any statement with the provisions of this section. [Added by Stats. 1968, ch. 1250, § 21.]"

The trial court found:

"29. Section 38956 prohibits manufacturers of trade products from

using labels and advertising commonly used or associated with the sale, advertising or distribution of milk products. Said proscription as to what is 'commonly associated' with the sale, etc. of milk products is a vague, uncertain and ambiguous term which leaves persons subject to such requirement with no basis for determining what is unlawful, and said section is therefore invalid insofar as the words 'or associated,' are employed."

We do not agree.

It is the declared intention of the Legislature to prevent false, misleading and deceptive marketing of products resembling milk products. (§ 38902, subd. (b).) Plaintiffs do not question the general power of the state to regulate labeling and advertising of food products but instead rely on the court's finding that the term "commonly associated" is too uncertain and vague a phrase upon which criminal and civil liability may be predicated. (*Market Basket* v. *Jacobsen,* 134 Cal.App.2d 73, 81 [285 P.2d 344].)

The registration provisions of chapter 6 (§§ 38941-38946) effectively insulate plaintiffs from the imposition of sanctions, should they, as they contend, "guess wrong" on what words are "commonly associated." As part of the required application, plaintiffs must submit the proposed label or labels for the product (§ 38942). If the director grants their application, the label is approved; if he capriciously denies it on the ground that the label is improper because it is commonly associated with milk products, plaintiffs may test that decision in the courts. Finally, it does not appear the phrase "commonly used or associated" is vague, especially if it is considered in tandem with the second sentence of section 38956 which prohibits *all* statements regarding milk products, except those permitted by section 38954. The obvious procedure is to submit such labels to the director for registration. If the application does not mention milk in any way, except as the resembling product may be validly compared to milk and its products (§ 38954) we must assume it will be approved. Plaintiffs' competitive advantage is thus preserved, as is the public's right to know what nature of food it is being persuaded to digest.

*Tie-in Sales*

For reasons which are not apparent from the record, plaintiffs attack section 61390 which provides: "The requirement by any distributor or manufacturer of the acceptance by a purchaser, handler, or retailer of any product resembling milk products as a condition of receiving any milk product, any other product resembling milk products or any other product

handled by such distributor or manufacturer is an unfair trade practice and unlawful. [Added by Stats. 1968, ch. 1250, § 24.]"

The trial court found that this section denies plaintiffs equal protection of the law in that it does not prohibit the tying of milk products to the sale of a resembling product. We disagree.

The subject of tying arrangements is within the domain of antitrust law (e.g. *United States* v. *Loew's Inc.*, 371 U.S. 38 [9 L.Ed.2d 11, 83 S.Ct. 97]; *Northern Pac. R. Co.* v. *United States,* 356 U.S. 1 [2 L.Ed.2d 545, 78 S.Ct. 514]; *International Salt Co.* v. *U.S.,* 332 U.S. 392 [92 L.Ed. 20, 68 S.Ct. 12].) Under certain circumstances tie-in sales may violate section 3 of the Clayton Act, section 1 of the Sherman Act or section 5 of the Federal Trade Commission Act. (Generally, see Tucker, *The Validity of Tying Arrangements under the Antitrust Laws,* 72 Harv.L.Rev. 50.) Thus it is clear that such practices may be prohibited as in fact they have been proscribed by section 61390.

A regulatory scheme is not invalid for its failure to cover the whole of a permissible field, since the Legislature is free to recognize degrees of harm and confine its regulations to those practices it deems most harmful. (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control,* 65 Cal.2d 349, 361 [55 Cal.Rptr. 23, 420 P.2d 735].) Regulating resembling products as a separate class is entirely reasonable. (*People* v. *Western Fruit Growers,* 22 Cal.2d 494, 506-507 [140 P.2d 13].) As the Attorney General points out, the Legislature apparently considered the tying of sales of resembling products to the sale of milk products a more likely situation than the converse since the resembling products lack the general acceptance and use of milk products. The legislative history of chapter 6 completely validates this analysis and the record is barren of any evidence of injury or damage to plaintiffs by reason of this section.

Even though plaintiffs have not made their position clear, their real complaint is that sellers of tying products (in this instance, as not covered by section 61390, competetive sellers of resembling products) enjoy a monopolistic position in the market. (See *Times-Picayune* v. *United States,* 345 U.S. 594, 608 [97 L.Ed. 1277, 1289-1290, 73 S.Ct. 872].)[16] Quite apart from the fact that there is nothing in the record to suggest this, the forum for the adjudication of this issue lies elsewhere.

---

[16]Since under section 61390 the tying product may also be a resembling product, it appears that it is only when the *tied* product is a milk product that section 61390 does not apply. To what extent this enhances the market position of competitive sellers of resembling products who also sell milk products we are unable to say in light of the absence of any facts bearing on this question.

*Signs and Menu Notices.*

■ Finally, we note that the trial court in its finding 26 held section 38905 unreasonable: "26. Section 38905 requires that certain establishments serving meals post signs or provide menu notices of specified minimum sizes stating 'beverages and products which are not milk products are served here.' Said statement is ambiguous, is not reasonably calculated to inform the public, and is misleading and does not inform the public. A sign in size sufficient to comply with the statute would be so large as to be unreasonable and to constitute an unreasonable burden on the person required to exhibit the same. The required size of the alternative menu notice is likewise unreasonable. For each of the foregoing reasons, the Court finds that the sign and notice requirements as to plaintiffs' products each constitutes a denial of due process and equal protection of the laws and is discriminatory, unconstitutional and void."

Plaintiffs introduced evidence at trial which showed that restaurants would rather discontinue use of products covered by chapter 6 than post the sign required by section 38905. The record does not show how the menu requirement is unreasonable and to the contrary, shows that plaintiffs offered "menu-clip-ins" to its customers. However, the Attorney General does not appeal from this portion of the court's judgment and reiterated approval thereof at oral argument. We approve.

Since we have held sections 38905 and 38904 to be unconstitutional, we note section 38907 which provides for the severability of the various provisions of chapter 6 in such an event. Our holdings on sections 38904 and 38905 do not invalidate the remainder of chapter 6. (*City of La Mesa* v. *Tweed & Gambrell Mill*, 146 Cal.App.2d 762, 771, 772 [304 P.2d 803].)

The judgment is reversed and remanded with directions to modify the findings of fact, conclusions of law and the judgment (permanent injunction) in terms consistent with this opinion. Each side to bear their own costs.

Fleming, J., and Compton, J., concurred.

A petition for a rehearing was denied October 16, 1972, and the petition of the plaintiffs and appellants for a hearing by the Supreme Court was denied November 15, 1972.