[Nos. B084686, B086063. Second Dist., Div. Three. Feb. 1, 1996.]

CHURCH OF SCIENTOLOGY OF CALIFORNIA, Plaintiff and Appellant, v.
LAWRENCE WOLLERSHEIM, Defendant and Respondent.

**COUNSEL**

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, Eric M. Lieberman, Michael Ludwig, Moxon & Bartilson, Kendrick L. Moxon and Laurie J. Bartilson for Plaintiff and Appellant.

Hagenbaugh & Murphy, Daniel A. Leipold and Mark Goldowitz for Defendant and Respondent.

John C. Barker, Elizabeth Pritzker, Gray, Cary, Ware & Freidenrich, Guylyn R. Cummins, Parker, Chapin, Flattau & Klimpl and Herbert L. Rosedale as Amici Curiae.

**OPINION**

**ALDRICH, J.—**

### INTRODUCTION

Plaintiff and appellant Church of Scientology (the Church) appeals from the order of the trial court granting the motion of defendant and respondent

Lawrence Wollersheim (Wollersheim) pursuant to Code of Civil Procedure section 425.16 (hereinafter, section 425.16) to dismiss the Church's complaint against him. The dismissed complaint attacked the judgment Wollersheim had obtained against the Church in a prior action (the prior action).[1] Section 425.16 was adopted in 1992 to deter and prevent so-called SLAPP (Strategic Lawsuits Against Public Participation) suits.

The Church contends the trial court erred in granting the motion because its action against Wollersheim is not a SLAPP suit as defined by section 425.16. The Church also contends the Church demonstrated the probability of the success of its complaint and therefore the motion should have been denied in any event. Furthermore, the Church contends, the amount awarded for attorney fees was excessive.

We find the motion to dismiss was properly granted and substantial evidence supports the award of attorney fees. We therefore affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

*The Prior Action*

The procedural history of this litigation spans more than 15 years. Wollersheim filed his original action against the Church on July 28, 1980. Wollersheim, a former member of the Church, had alleged the Church intentionally and negligently inflicted severe emotional injury on him through certain practices, including "auditing," "disconnect," and "fair game."

During the pendency of that lawsuit Scientology affiliates (Scientology) sued Wollersheim, his counsel, and his expert witnesses in the prior action in a RICO (Racketter Influenced and Corrupt Oranizations Act) action in the federal district court in Los Angeles. Thereafter, Scientology petitioned the Ninth Circuit Court of Appeals to disqualify the entire United States District Court for the Central District of California. In an unprecedented ruling the Ninth Circuit struck the motion from its records. Thereafter the RICO action was dismissed by the court. Scientology once again appealed to the Ninth Circuit Court of Appeals which affirmed the dismissal. (*Religious Technology Center* v. *Wollersheim* (9th Cir. 1992) 971 F.2d 364; cert. den. (1987) 479 U.S. 1103 [94 L.Ed.2d 187, 107 S.Ct. 1336].)

In March 1986, Judge Ronald Swearinger, the superior court judge assigned as the trial judge in the prior action, ordered the Church to produce its

---

[1] *Wollersheim* v. *Church of Scientology* (1989) 212 Cal.App.3d 872 [260 Cal.Rptr. 331].

"auditing" and "pre-clear" files on Wollersheim. Thereafter, the Church sued Judges Alfred Margolis (who had made previous pretrial rulings in the case) and Swearinger and the entire Los Angeles Superior Court in federal district court. (Church of Scientology v. Superior Court, (U.S. Dist. Ct. (C.D.Cal.), No. CV 86-1362ER.) This suit was dismissed by the court in November 1986.

After much discovery and several petitions for writs of mandate to the Court of Appeal brought by the Church, the prior action went to trial in superior court on February 18, 1986, before Judge Swearinger. After five months of trial the jury returned its verdict in favor of Wollersheim on July 22, 1986. It assessed compensatory damages in the sum of $5 million and punitive damages in the sum of $25 million against the Church. On August 8, 1986, the Church filed its motion for new trial and for judgment notwithstanding the verdict both of which were denied on September 18, 1986, after three days of oral argument. The Church thereafter appealed to the Second District Court of Appeal which reversed as to the cause of action for negligent infliction of emotional injury, affirmed the judgment as to the cause of action for intentional infliction of emotional injury and modified the judgment to reduce the compensatory damages to $500,000 and the punitive damages to $2 million. (*Wollersheim* v. *Church of Scientology*, *supra*, 212 Cal.App.3d 872.) The Church then petitioned the California Supreme Court for review which was denied. Upon the Church's petition for a writ of certiorari, the United States Supreme Court vacated the judgment of the Court of Appeal and remanded to that court for reconsideration in light of the Supreme Court's ruling in *Pacific Mutual Life Insurance Co.* v. *Haslip* (1991) 499 U.S. 1 [113 L.Ed.2d 1, 111 S.Ct. 1032]. (*Church of Scientology of California* v. *Wollersheim* (1991) 499 U.S. 914 [113 L.Ed.2d 234, 111 S.Ct. 1298].)

On remand the Court of Appeal adhered to its original decision, affirming the judgment subject to a remittitur. (*Wollersheim* v. *Church of Scientology** (Cal.App.).) Once again the Church petitioned the California Supreme Court for review and on July 23, 1992, review was granted. However, on July 15, 1993, following the United States Supreme Court's decision in *TXO Production Corp.* v. *Alliance Resource Corp.* (1993) 509 U.S. 443 [125 L.Ed.2d 366, 113 S.Ct. 2711], the California Supreme Court dismissed its prior grant of review. The Church's subsequent petition for writ of certiorari to the United States Supreme Court was denied on March 7, 1994.

*The Instant Litigation*

While its appeal in the prior action was pending before the California Supreme Court, the Church filed this action on February 16, 1993, seeking to

---

*Review of opinion (B023193) was dismissed July 15, 1993.

638

set aside the judgment Wollersheim had obtained against the Church on July 22, 1986. The complaint alleged that newly discovered evidence demonstrated that the trial judge *appeared* to, or did, harbor actual malice and prejudice against the Church at the time of the trial and *may* have conveyed prejudicial information to the jury, either directly or indirectly.

The "newly discovered evidence" alleged in the complaint consisted of the following: posttrial interviews with jurors by the Church's attorneys revealed that "the jurors 'believed' that they were being followed by members of the [Church]." Juror Terri Reuter stated that "the jury had been told by 'unnamed court personnel,' whom she refused to identify, that during the trial, Judge Swearinger's tires had been slashed, and that his dog had been found dead. She said that the jurors attributed these actions to unknown and unnamed members of the [Church]." The complaint stated that Church counsel suspected that private investigators hired by Wollersheim's counsel "were responsible for 'dirty tricks' designed to implicate the Church, and prejudice the jury." Additionally, the complaint alleged that, because Judge Swearinger refused "to allow[] discovery into the jurors in order to establish the extent and source of the taint," "[t]he source of the jury's bias thus remained a mystery for five years."

The complaint continued, "Finally, in an interview with William W. Horne, a reporter employed by *The American Lawyer* magazine which took place in 1992, Judge Swearinger revealed that he maintained a condition of mind of unfavorable bias against the Church during the trial of the Prior Action. According to Horne, Judge Swearinger stated that his dog had drowned in the family swimming pool during the trial of the Prior Action, and that the judge believed that he had been followed when in his car throughout the trial. The judge informed Horne that, while he was in possession of no evidence to corroborate the suspicions he harbored, he nonetheless felt that members of the Church of Scientology were responsible for such actions." On March 19, 1992, Horne revealed Judge Swearinger's statements to the Church's attorneys, Eric M. Lieberman and Jonathan Lubell. "For the first time, the Church and its attorneys suspected that the source of infection of the jury was the judge himself."

The complaint continued, alleging Horne provided further details of the judge's statements to the Church's attorney, Michael L. Hertsberg, on March 23, 1992. Horne allegedly stated the judge told him the judge's veterinarian told him the dog was old and had died of a heart attack, yet the judge still felt the dog had fallen or been pushed into the pool. Also, Horne stated the judge had said he felt the Church was somehow responsible for the dog's

death. The judge also told Horne that he had been followed "a few times" in his car during the trial and he had assumed the Church was responsible for these actions.

Horne's article in the July/August 1992 issue of The American Lawyer quoted Judge Swearinger as saying:

" 'I was followed [at various times] throughout the trial . . . and during motions for a new trial . . . . All kinds of things were done to intimidate me, and there were a number of unusual occurrences during that trial. My car tires were slashed. My collie drowned in my pool. But there was nothing overtly threatening, and I didn't pay any attention to the funny stuff.' " (Horne, *The Two Faces of Scientology* (July/Aug. 1992) Am. Law., p. 77.)

Upon information and belief, the Church alleged that the judge described these incidents to court personnel during the trial and that court personnel revealed them to the jurors, "resulting in a jury as biased as the judge."

The complaint referred to other occasions in which the judge made statements to others regarding the Church. In April 1992, during a chamber's conference in an unrelated case, Judge Swearinger stated to Wollersheim's appellate lawyer "that he believed the award of damages . . . was excessive but that he had deliberately chosen to allow the excessive verdict to stand because of his displeasure with the Church and its trial counsel." The judge referred to the Church's counsel, Earl Cooley, as Earl "Fooley," "because Mr. Cooley had alleged that there had been tampering with the jury." Judge Swearinger allegedly repeated the substance of this discourse in a telephone conversation with Church counsel: he stated he did not reduce the jury's damage award "because such an action would have given credibility to Mr. 'Fooley's' charge that the jury was tainted." These comments, the complaint alleged, revealed the judge possessed unfounded suspicions and unfavorable beliefs regarding the Church and that he "improperly permitted entry of a judgment he knew to be outrageous, and the result of bias and prejudice, in order to conceal that he, himself, was the source of the jury's bias and prejudice." The Church alleged it was recently apprised of this information and prayed the judgment be declared null and void. The complaint was verified by James Morrow, president of the Church of Scientology California.

Wollersheim filed a special motion to strike pursuant to section 425.16, arguing that such a motion was authorized by that provision and that the Church could not demonstrate a probability that it would prevail on its

claims. The motion, as subsequently amended, presented a number of contentions: (1) the court had no jurisdiction over the action because the main action was pending before the California Supreme Court; (2) the court had no jurisdiction because the action was "merely a disguised attempt" to bring an untimely motion for a new trial; (3) the action was barred because the Church had not exercised due diligence in raising its claims; (4) the Church did not plead and could not show that it has a meritorious defense to the main action; (5) the complaint is not sufficient to set aside the judgment because it alleges at most intrinsic fraud; (6) the Church could not demonstrate a probability that it would prevail on its claim; (7) the Church could not demonstrate a probability that it could prove key facts which were alleged in the complaint; (8) the action is part of the Church's litigation strategy to use the courts to harass opponents; (9) the action was part of the Church's litigation strategy of attacking judges who rule against them as biased; and (10) the Church has unclean hands and is not entitled to the equitable relief sought. Wollersheim argued that the Church could not meet his affirmative defenses: laches, unclean hands and collateral estoppel.

In support of his motion, Wollersheim submitted the following: Charles B. O'Reilly, the lead counsel for Wollersheim at trial and on the initial appeal, declared that Judge Alfred Margolis ruled on the Church's pretrial motions in the main action which sought to preclude any reference to the Church's "auditing" of Wollersheim. When the motions were denied, two affiliates of the Church, Religious Technology Center (RTC) and the Church of Scientology International (CSI), filed "a so-called RICO action" in the United States District Court for the Central District of California against Wollersheim, his two designated experts, and his counsel, including O'Reilly, "seeking basically the same relief that had been denied by Judge Margolis." A special master determined the action to be "not only frivolous but bordering on malicious," and accordingly the action was dismissed by the judge of the district court, the dismissal affirmed on appeal in *Religious Technology Center* v. *Wollersheim* (9th Cir. 1992) 971 F.2d 364.) While the RICO action was still pending, the Church, RTC, and/or CSI filed a motion/petition in the Ninth Circuit seeking to disqualify the entire United States District Court for the Central District of California on the ground of bias and prejudice against the Church. The motion/petition was ordered struck from the record by the Ninth Circuit.

O'Reilly declared that, due to his calendar, Judge Margolis withdrew from the main action. The Church moved to disqualify the entire Los Angeles Superior Court and/or to transfer the action to another county on the ground the entire court was biased. The motion was denied as well as the Church's

writ petition to the Court of Appeal. The case was assigned to Judge Lopez and the Church filed a Code of Civil Procedure section 170.6 motion to disqualify him. The action was assigned to Judge Swearinger for trial. After ruling the Church was required to produce its auditing file, the Church filed an action in United States District Court against the judge and others claiming bias and prejudice. This federal case was dismissed. (Church of Scientology v. Superior Court (U.S. Dist. Ct. (C.D.Cal. 1986), No. CV 86-1362.) Later, after the judge denied the Church's motion for nonsuit on the intentional infliction of emotional distress cause of action, the Church filed a formal motion to disqualify him for cause, bias and prejudice, which motion was denied.

Wollersheim declared that he had liquidated all of his assets, personally spent about $300,000, and gone more than $900,000 into debt, not including attorney fees, during the litigation of the main action and related litigation, over an 11-year period.

Andre A. Anderson, the jury foreperson in the prior action, declared that "from the start of the trial up through the return of the verdict, there was no reference to nor comment, by any juror or by any other person in my presence, about the trial judge, the Honorable Ronald Swearinger, to the effect that his tires had been slashed, or that his dog had died, or that he was being followed or in any other way harassed or bothered by Scientology." Antoinette Saldana, one of the court bailiffs present during the trial, declared that she, "as well as all court personnel, took precautions to ensure that no one discussed the case with members of the jury or with anyone outside the courtroom." Also, she declared that she was never aware of any unfavorable beliefs or biases held by the judge against the Church, and the judge never mentioned any strange occurrences for which he suspected the Church was or might be responsible. He did not mention that his tires were slashed. He mentioned his dog had died but never suggested the Church might be responsible for the dog's death.

Declarations of former members and officials of the Church, Gerald Armstrong and Vicki Aznaran, revealed the practices and policies of the Church, including its "fair game" doctrine and employment of litigation practices designed "to bludgeon the opposition into submission," as well as attacks against judges who rule against it. The declaration of an attorney who had represented the Church (Joseph A. Yanny), submitted in an action brought by the Church against him and others, related aspects of the Church's "fair game" doctrine, including copies of exhibits to demonstrate "the Cult, according to written policy, will use any means legal or illegal to

subvert and frustrate judicial process against them, and will willingly and knowingly abuse judicial process in order to attack perceived 'enemies.' "

The Church opposed Wollersheim's motion to strike and requested sanctions against Wollersheim and his attorneys. The Church contended Wollersheim's free speech and petition rights were not the subject of the complaint. The Church argued that even if section 425.16 applied, the Church could establish the probability that it would prevail.

To demonstrate that the Church could meet its burden of proof (which the Church contended was the production of "evidence demonstrating the existence of a material factual issue as to its claim . . ."), the Church submitted the declaration of counsel, Paul F. Moore II, which had been submitted in support of the Church's application for a new trial in the prior action. Moore had declared that on August 18, 1986, Terri Reuter confirmed that the facts discussed in an "attached declaration" were true but she said she would not sign any declaration because she did not want to do anything to jeopardize the verdict. Ms. Reuter told him, he declared, that she knew that she and other members of the jury were being followed but she could not prove it and that within the last week she was told by some court personnel that the judge's tires had been slashed and his dog had been found dead. "This was told to me in conjunction with our conversations about the trial and in particular in relation to Defendant's alleged practice of 'Fair Game.' " There was no declaration of Terri Reuter attached to Moore's declaration submitted in this action.

The Church also submitted the declaration of Eric M. Lieberman. Lieberman declared he had been interviewed on March 10, 1992, by William Horne, a reporter for the American Lawyer and Horne told Jonathan Lubell and him that Judge Swearinger had told Horne he believed the Church had attempted to harass him during the course of the trial. The Church also submitted an unauthenticated copy of the American Lawyer article by Horne, entitled *The Two Faces of Scientology*, in which Judge Swearinger is quoted.[2]

In addition, Barry Van Sickle, who represented Wollersheim in his defense of the appeal in the prior action, declared that on April 6, 1992, Judge

---

[2]The article states: "California superior court judge Ronald Swearinger, who presided over the *Wollersheim* trial, describes the case itself as anything but normal: Church trial lawyer Cooley and his co-counsel, the late John Peterson, filed a number of unsuccessful 'writs and motions' throughout the trial in an attempt to halt it, according to Judge Swearinger. Three days into the trial, the judge says, they moved for his disqualification based on 'some secret conversation I'd had with someone I'd never heard of.' They also filed a Section 1983 federal civil rights action against both him and the judge who sat on the case prior to him, says Swearinger, on the theory that by allowing the case to go to trial, the judges were denying the

Swearinger expressed an interest in acting as a "facilitator" in resolving the *Wollersheim* matter, now that the Court of Appeal had issued its opinion. On the judge's request, Van Sickle contacted the Church's counsel in charge of settlement matters, Mr. Drescher. Drescher declared he spoke on the telephone with Judge Swearinger a day or two later, and the judge stated that at the time of new trial motions he considered the jury award should have been reduced in the fashion that the Court of Appeal did, but that he did not do this because he was upset with Church counsel, whom Judge Swearinger called "Fooley." "In particular, Judge Swearinger told me that he was angered by Mr. Cooley arguing to the Court before a packed gallery, including media, that the jury had been 'in the tank' and that there was no way that he would reduce that verdict after Mr. Cooley had raised those allegations for fear of validating them."

The trial court stayed the proceedings, including discovery, pending a final ruling by the California Supreme Court on the petition for review of the prior action by the Church. On July 15, 1993, the California Supreme Court dismissed the petition and remanded to Division Seven of the Second Appellate District. Wollersheim reset his motion after the remittitur was issued and the opinion of the Court of Appeal became final.

The parties submitted additional argument and documentation. Wollersheim submitted the declaration of Steven Fishman, on parole for a conviction of mail fraud. He was a former member who had been sued by the Church. Fishman declared that in the late summer or early fall of 1986 another Scientologist told him that he had drowned a dog named "Duke" that belonged to a Judge Swearinger. Fishman also declared that, as part of "Operation Wolly," he had been ordered to call up jurors in the Wollersheim case in the middle of the night and hang up on them. He relayed details of

---

church its civil rights. (Cooley confirms that the Section 1983 action and the disqualification motion were filed.) [¶] But Swearinger's recollections of the oddities of the *Wollersheim* case go beyond court filings: 'I was followed [at various times] throughout the trial . . . and during the motions for a new trial,' the judge claims. 'All kinds of things were done to intimidate me, and there were a number of unusual occurrences during that trial. My car tires were slashed. My collie drowned in my pool. But there was nothing overtly threatening, and I didn't pay attention to the funny stuff.' " (Horne, *The Two Faces of Scientology*, Am. Law., *supra*, at pp. 77, 78.)

"At the trial Scientologists packed the courtroom and hallways of the courthouse and regularly interrupted the proceedings by protesting against alleged religious discrimination. [¶] 'I'd let the jury out, let the [protesters] blab on, and then let the jury back in,' says Judge Swearinger. 'It didn't bother me.' Swearinger says he thought Cooley's histrionics were 'comical' rather than effective, and that he often caught the jury 'rolling their eyes' at Cooley's 'loud talk and hostility to opposing counsel and witnesses.' The jury returned a $30 million verdict in July 1986; $5 million in compensatory damages and $25 million in punitives." (Horne, *The Two Faces of Scientology*, Am. Law., *supra*, at p. 78.)

his involvement in raiding the trash dumpster of the law office of Charles O'Reilly. He also reported that an "agent" had been assigned to work in O'Reilly's law office as a typist/clerk/receptionist, to copy legal briefs and to influence O'Reilly into forcing Wollersheim to accept a settlement from the Church.

Wollersheim's counsel, Mark Goldowitz, declared that he had actively participated in the enactment of the anti-SLAPP legislation. He traced the legislative history of Senate Bill No. 1264, 1991-1992 Regular Session, which he contended demonstrated the intent to cover all lawsuits and other lawsuit-related communications as petition activity.

The Church disputed Wollersheim's interpretation of the applicability of section 425.16. The Church attacked the credibility of Fishman, submitting declarations containing statements which contradicted Fishman's. In reply, Wollersheim submitted a supplemental declaration of Fishman, accusing of lying the persons who said the statements in his declaration were false.

On March 30, 1994, the trial court granted the motion to strike the complaint "for the reasons set forth in Defendant's moving papers," and dismissed the action with prejudice.

The Church appealed. Thereafter, the trial court granted Wollersheim's motion for an award of attorney fees, pursuant to subdivision (c) of section 425.16. The Church appealed from that judgment and the two appeals were consolidated.

## ISSUES

Does section 425.16 apply to this action?

If it does, did the Church demonstrate there is a probability it would prevail?

Did the trial court abuse its discretion in setting the amount of the award of attorney fees?

## DISCUSSION

1. *Section 425.16 provides a remedy for SLAPP suits.*

Section 425.16 is designed to protect citizens in the exercise of their First Amendment constitutional rights of free speech and petition. It is California's response to the problems created by meritless lawsuits brought to harass those who have exercised these rights.

SLAPP suits have been defined as ". . . 'civil lawsuits . . . that are aimed at preventing citizens from exercising their political rights or punishing those who have done so.' (Canan & Pring, Strategic Lawsuits Against Public Participation (1988) 35 Social Problems 506.)" (*Wilcox* v. *Superior Court* (1994) 27 Cal.App.4th 809, 815 [33 Cal.Rptr.2d 446].) They are brought, not to vindicate a legal right, but rather to interfere with the defendant's ability to pursue his or her interests. Characteristically, the SLAPP suit lacks merit; it will achieve its objective if it depletes defendant's resources or energy. The aim is not to win the lawsuit but to detract the defendant from his or her objective, which is adverse to the plaintiff. (See *Wilcox* v. *Superior Court, supra,* at pp. 815-817, and authorities cited therein.)

California enacted section 425.16 to provide a procedural remedy to resolve such a suit expeditiously. Section 425.16 provides, in relevant part, as follows:

"(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.

"(b) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

"If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination.

"(c) In any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is

solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

"(e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest.

"(f) The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper.

"(g) All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The motion shall be noticed for hearing not more than 30 days after service unless the docket conditions of the court require a later hearing. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision. . . ."

■ The moving party bears the initial burden of establishing a prima facie showing the plaintiff's cause of action *arises* from the defendant's free speech or petition activity. (*Wilcox* v. *Superior Court, supra*, 27 Cal.App.4th at p. 820.) "The defendant may meet this burden by showing the act which forms the basis for the plaintiff's cause of action was a written or oral statement made before a legislative, executive, or judicial proceeding . . . ." (*Ibid.*) If the defendant establishes a prima facie case, then the burden shifts to the plaintiff to establish " 'a probability that the plaintiff will prevail on the claim,' " i.e., "make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor." (*Id.* at p. 823.) In making its determination, the trial court is required to consider the pleadings and the supporting and opposing affidavits stating the facts upon which the liability or defense is based. (§ 425.16, subd. (b).) Discovery is stayed upon the filing of the motion. (§ 425.16, subd. (g).) However, upon

noticed motion and for good cause shown, the court may allow specified discovery.[3]

2. *The Church's action was properly subjected to a section 425.16 motion to strike.*

a. *Section 425.16 applies to a cause of action arising from defendant's valid exercise of his petition rights, including litigation activities.*

■ In accordance with the accepted principles of statutory interpretation, we first examine the language of the statute to determine the Legislature's intent. If the language is clear and unambiguous there is no need to resort to other interpretative aids, such as the legislative history. (*Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 73 [276 Cal.Rptr. 130, 801 P.2d 373].)

■ Section 425.16 applies to a cause of action against a person "arising from any act of that person in furtherance of the person's right to petition or free speech under the United States or California Constitution in connection with a public issue." (§ 425.16, subd. (b).)

Subdivision (e) of section 425.16 expressly defines the First Amendment activity from which the subject cause of action arises as "*includ[ing]* [1] any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; [2] any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or [3] any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (Italics added.)

The right of access to the courts is an aspect of the First Amendment right to petition the government for redress of grievances. (*McDonald* v. *Smith* (1985) 472 U.S. 479, 482-484 [86 L.Ed.2d 384, 388-390, 105 S.Ct. 2787]; *California Motor Transport Co.* v. *Trucking Unlimited* (1972) 404 U.S. 508, 510 [30 L.Ed.2d 642, 646, 92 S.Ct. 609]; *Bill Johnson's Restaurants, Inc.* v. *NLRB* (1983) 461 U.S. 731, 740 [76 L.Ed.2d 277, 287, 103 S.Ct. 2161];

---

[3]The provisions of section 425.16 were designed to provide an economical and expeditious remedy to SLAPP suits. The defendant may file a motion to strike within 60 days of the service of the complaint. Because the motion is heard within 30 days of the notice of the motion, the plaintiff's case may not be developed. However, the provision allowing discovery for good cause provides plaintiff a means to avoid any legitimate prejudice due to the alacrity of the proceedings. Scientology did not file a motion to conduct additional discovery.

see also *Matossian* v. *Fahmie* (1980) 101 Cal.App.3d 128, 135-137 [161 Cal.Rptr. 532].) "The [United States Supreme Court] traditionally has held that the Due Process Clauses protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances." (*Logan* v. *Zimmerman Brush Co.* (1982) 455 U.S. 422, 429 [71 L.Ed.2d 265, 273, 102 S.Ct. 1148].)[4] A cause of action "arising from" defendant's litigation activity may appropriately be the subject of a section 425.16 motion to strike.

 The Church contends section 425.16 does not apply because its action against Wollersheim is not an attack on Wollersheim personally and would not interfere with Wollersheim's right to pursue his claims against the Church—i.e., the Church's complaint does not "arise" from any act in furtherance of Wollersheim's right of petition or free speech because the Church does not challenge Wollersheim's right to file a lawsuit nor is its lawsuit "brought primarily to chill the valid exercise" of that right.

The Church's approach to the interpretation of section 425.16 is too restrictive, suggesting that only a direct personal attack on the defendant would be subject to a motion to strike.

The statutory language, however, is clear and unambiguous. (*Rojo* v. *Kliger*, *supra*, 52 Cal.3d at p. 73.) It specifically applies to "[*a*] *cause of action against a person arising from any act of that person in furtherance of the person's right of petition*" including a "written or oral statement or writing made in connection with an issue under . . . review by a . . . judicial body . . . ." (§ 425.16, subds. (b), italics added, & (e).) And, thus, it literally applies to any direct attack on the *judgment* in the prior action, which resulted from Wollersheim's petition activity.

Furthermore, an examination of the history of the underlying litigation reveals that the instant action is consistent with a pattern of conduct by the Church to employ every means, regardless of merit, to frustrate or undermine Wollersheim's petition activity. When a party to a lawsuit engages in a course of oppressive litigation conduct designed to discourage the opponents' right to utilize the courts to seek legal redress, the trial court may properly apply section 425.16. We hold that in making that determination, the trial court may properly consider the litigation history between the

---

[4]The right to petition is not absolute, providing little or no protection for baseless litigation or sham or fraudulent actions. Under the statutory scheme, a motion to strike cannot be successful unless the plaintiff's action is a meritless attempt to interfere with the defendant's exercise of petition activity and it is shown it lacks merit. Thus section 425.16 protects the defendant from retaliatory action for his or her exercise of legitimate petition rights but does not unconstitutionally interfere with the plaintiff's own petition rights.

parties. The legislative rationale in enacting the statute is consistent with such an analysis because acts which are designed to discourage the bringing of a lawsuit are no more oppressive than acts which seek to prolong the litigation to a point where it is economically impracticable to maintain and pursue it to a final conclusion. When one party to a lawsuit continuously and unsuccessfully uses the litigation process to bludgeon the opponent into submission, those actions must be closely scrutinized for constitutional implications.

In the instant action the Church's actions clearly fall within the ambit of section 425.16. Among its other litigation strategies, the Church has filed two nonmeritorious federal court actions as well as this one.[5] The Church has filed numerous appeals in state and federal courts and has prolonged Wollersheim's 1980 lawsuit for 15 years. When the litigation actions of the Church are analyzed in the light of the entire litigation history between the parties, it appears the instant lawsuit was brought by the Church against Wollersheim: (a) in retaliation for his 1980 lawsuit against the Church; (b) to punish him economically for bringing that lawsuit; and (c) to obliterate the value of any victories over the Church by forcing him to abandon his efforts to recover the damages awarded in the prior action by making it too costly to do so.[6]

The Church argues that it has every right to exhaust its legal remedies, including appeal rights. We agree. However, when a litigant continuously and unsuccessfully uses the litigation process in filing unmeritorious motions, appeals and lawsuits, such actions have constitutional implications which may be reviewed on a motion under section 425.16.

The Church also argues it has been successful in its posttrial motion and appellate strategy and therefore, even if the litigation history is considered, it

[5]Just prior to oral argument we were informed by counsel for Wollersheim that on August 21, 1995, Scientology filed still another action against Wollersheim in the federal district court of Colorado. Wollersheim complains that through a civil writ of seizure in that action the Church has seized over 600,000 documents from Wollersheim and has used that lawsuit to conduct discovery as to Judge Swearinger, Attorney Charles O'Reilly and Daniel Leipold, the trial judge, and Wollersheim's past and present attorneys respectively in the prior action, in violation of the automatic stay order of section 425.16. The Church objects to our considering the Colorado lawsuit on the grounds that it is irrelevant to the proceedings herein. Inasmuch as we know nothing of the facts underlying that lawsuit we agree with the Church and decline to consider that lawsuit in this appeal. We will leave the issue of whether that suit is meritorious to the Colorado courts.

[6]Wollersheim declares he has spent $300,000 and is indebted for another $900,000 as a result of his disputes with the Church.

favors the Church. We disagree. The only relief the Church has obtained from all of its lawsuits, petitions for writs of mandate, appeals to the California Court of Appeal and the Ninth Circuit Court of Appeals, the California and the United States Supreme Courts was obtained in the initial state court appeal in 1989 which resulted in a reduction of Wollersheim's judgment. The fact that both the California and the United States Supreme Courts granted the Church's petitions was no more than fortuitous as both courts at that time were reviewing the issue of punitive damages. In each instance, however, the case was remanded to the intermediate appellate courts with no change in ruling.

■ The Church also argues that Wollersheim's tort action against a private party (the Church) was not a matter of public interest subject to the protection of section 425.16. Subdivision (e), describing protected activity, refers to three categories; only the category of activity referred to as the "exercise of free speech rights" is subject to the limitation that it be "made in a place open to the public or a public forum in connection with an issue of public interest."[7] The first two categories parallel the description of privileged communications in Civil Code section 47, subdivision (b) and include judicial proceedings without any limitation as to subject matter.[8]

But even if we were to assume that a motion to strike pursuant to section 425.16 were limited to issues of public interest, the motion would apply to this action against Wollersheim, arising from his lawsuit against the Church. Although matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals. Examples are product liability suits, real estate or investment scams, etc. (See *Wilcox* v. *Superior Court, supra,* involving an

---

[7]See, e.g.,*Wilcox* v. *Superior Court, supra,* 27 Cal.App.4th at page 820, citing *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1136 [270 Cal.Rptr. 1, 791 P.2d 587].) The *Bear Stearns* court placed limits on the ability to bring a tort action against persons who brought an action or induced another to bring an action against plaintiff. "If any person who induced another to bring a lawsuit involving a colorable claim could be liable in tort, free access to the courts could be choked off with an assiduous search for unnamed parties. . . . [I]t would defeat the purpose of assuring free access to the courts, and cause a flood of oppressive derivative litigation, to assess tort liability for their activities." (*Id.* at p. 1136.)

[8]Civil Code section 47, subdivision (b) refers to privileged publication or broadcast made in any "(1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure . . . [with certain exceptions thereafter listed]."

action against private entities.) The record reflects the fact that the Church is a matter of public interest, as evidenced by media coverage and the extent of the Church's membership and assets. Furthermore, the underlying action concerned a fundamental right, the constitutional protection under the First Amendment religious practices guaranties, and addressed the scope of such protection, concluding that the public has a compelling secular interest in discouraging certain conduct even though it qualifies as a religious expression of the Scientology religion. (*Wollersheim* v. *Church of Scientology*, *supra*, 212 Cal.App.3d at pp. 887-900.)

The Church objects that the application of section 425.16 to any action arising from the defendant's exercise of petition rights through litigation would subject all counterclaims and other claims relating to a defendant's prior legal action to a special motion to strike.

■ Although a cross-complaint may be subject to a section 425.16 motion, not all cross-complaints would qualify as SLAPP suits. A defendant may file a cross-complaint against the plaintiff for any existing cause of action regardless of its nature and origins. (Code Civ. Proc., § 428.10, subd. (a).) Only those cross-complaints alleging a cause of action *arising* from the plaintiff's act of filing the complaint against the defendant and the subsequent litigation would potentially qualify as a SLAPP action. (§ 425.16, subds. (b) and (d).) For example, a person may attempt to bring a SLAPP suit alleging that libelous allegations or statements were contained in the complaint itself. However, because defendant's allegations are privileged communications under Civil Code section 47, the suit would be meritless. (See, e.g., *California Physicians' Service* v. *Superior Court* (1992) 9 Cal.App.4th 1321 [12 Cal.Rptr.2d 95].)

A compulsory cross-complaint on a "related cause of action" against the plaintiff (Code Civ. Proc., § 426.30, subd. (a)) would rarely, if ever, qualify as a SLAPP suit arising from petition activity. By definition, a "related cause of action" is "a cause of action which *arises out of the same transaction, occurrence, or series of transactions or occurrences as the cause of action which the plaintiff alleges in his complaint.*" (Code Civ. Proc., § 426.10, subd. (c), italics added.) The SLAPP suit is not "related" to the transaction or occurrence which is the subject of the plaintiff's complaint, but arises out of the litigation process itself.

b. *Section 425.16 applies to any cause of action arising from petition activity, not only tort actions.*

The Church also argues section 425.16 applies to tort actions only.[9]

Considering the purpose of the provision, expressly stated, the nature or form of the action is not what is critical but rather that it is against a person who has exercised certain rights such as Wollersheim did in the prior action against the Church. Although the "favored causes of action" in SLAPP suits may be defamation, various business torts, nuisance and intentional infliction of emotional distress (*Wilcox* v. *Superior Court, supra,* 27 Cal.App.4th at p. 816), the Legislature did not limit application of the provision to such actions, recognizing that all kinds of claims could achieve the objective of a SLAPP suit—to interfere with and burden the defendant's exercise of his or her rights.

The Church argues that "The legislature was especially concerned by the threat to the exercise of constitutional rights posed by a complaint demanding costly damages, which is likely to be a tort suit demanding punitive damages. Thus, because of the possibility of punitive damages, a SLAPP suit in tort poses the greatest threat to the exercise of constitutional rights; therefore, it was against these tort suits that the legislature directed its statutory remedy." Once again the Church's construction of the legislative intent behind section 425.16 is too restrictive. There is no such limiting language in the statute. Moreover, the free exercise of the constitutional right of judicial redress is no less threatened by the employment of nontortious litigation practices designed to economically "bludgeon the opposition into submission." In either case the result is to subject the litigant to economic loss sufficient to discourage the free exercise of a constitutionally protected right.

Furthermore, the Church's argument that its complaint sought no relief or judgment directly against Wollersheim and therefore he would remain free

---

[9]The Church points to comments in the legislative history and language from *Wilcox* v. *Superior Court, supra,* 27 Cal.App.4th 809, regarding these particular aspects of SLAPP suits. For example, in discussing SLAPP suits, *Wilcox* stated, "The favored causes of action in SLAPP suits are defamation, various business torts such as interference with prospective economic advantage, nuisance and intentional infliction of emotion distress. . . . Plaintiffs in these actions typically ask for damages which would be ruinous to the defendants. . . . [¶] SLAPP suits are brought to obtain an *economic* advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff." (*Id.* at p. 816, original italics, citations omitted.) Nothing in *Wilcox* or the statute specifically limits the applicability of section 425.16 to tort actions only. Furthermore, as Wollersheim correctly points out, the comments about tort actions are contained in documents which do not constitute legislative history.

to assert and pursue his claims against the Church is equally misplaced. The Church's complaint asserted that the judgment in the prior action should be declared null and void and a new trial should be ordered. The effect of such an order would be to directly impact Wollersheim by requiring him to incur further economic hardship by relitigating a matter that has already consumed fifteen years of litigation; a five-month jury trial; at least two appeals and six writ petitions in the Court of Appeal; two petitions for review in the California Supreme Court; two petitions for certiorari in the United States Supreme Court and two lawsuits in federal district court, all arising out of Wollersheim's original 1980 lawsuit against the Church.

3. *The Church failed to establish the "probability" it would prevail on its claim.*

Once the defendant has met the burden of establishing that section 425.16 applies to the lawsuit, the burden shifts to the plaintiff to establish "that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b).) On appeal, we independently review the entire record to determine whether the Church made a sufficient prima facie showing that it would prevail in light of the applicable law relative to the claim. (Cf. *Robertson* v. *Rodriguez* (1995) 36 Cal.App.4th 347, 357-358 [42 Cal.Rptr.2d 464] [libel action which requires clear and convincing evidence of malice].)

"In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b).)

*Wilcox* held that the "probability" hurdle was met if the plaintiff demonstrated sufficient facts to establish a prima facie case, similar to the standard used in determining a motion for nonsuit or directed verdict. (*Wilcox* v. *Superior Court, supra*, 27 Cal.App.4th at p. 824.) "To establish 'a probability that the plaintiff will prevail on the claim' the plaintiff must make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor." (*Id.* at p. 823.) The *Wilcox* court observed that the original version of Senate Bill No. 1264 required a "substantial" probability, but it was amended to eliminate the adjective. (27 Cal.App.4th at p. 824.) Nevertheless, the court reasoned the Legislature did not intend a threshold lower than a "reasonable probability." "Rather, it appears the Legislature eliminated the word 'substantial' in order to avoid the implication the trial court was to weigh the evidence which . . . would raise a serious constitutional problem [regarding the preservation of the plaintiff's right to a jury trial]. [Citation.]" (*Id.* at pp. 824-825.)

The court explained, "[T]he common features of SLAPP suits are their lack of merit and chilling of defendants' valid exercise of free speech and the right to petition the government for a redress of grievances. . . . Section 425.16 was intended to address those features by providing a fast and inexpensive unmasking and dismissal of SLAPP's. . . . It is also presumed the Legislature intended to enact a valid statute. . . . Anti-SLAPP legislation, therefore, must be fast, inexpensive and *constitutional* or it is of no benefit to SLAPP victims, the court or the public. In order to satisfy due process, the burden placed on the plaintiff must be compatible with the early stage at which the motion is brought and heard (§ 425.16, subds. (f) and (g)) and the limited opportunity to conduct discovery (subd. (g)). In order to preserve the plaintiff's right to a jury trial the court's determination of the motion cannot involve a weighing of the evidence." (27 Cal.App.4th at p. 823, citations omitted, original italics.)

Subsequent appellate decisions have employed the standard applied in *Wilcox.* (See *Evans* v. *Unkow* (1995) 38 Cal.App.4th 1490, 1496 [45 Cal.Rptr.2d 624]; *LaFayette Morehouse, Inc.* v. *Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 867 [44 Cal.Rptr.2d 46], review den.; *Ludwig* v. *Superior Court* (1995) 37 Cal.App.4th 8, 15 [43 Cal.Rptr.2d 350], review den.; *Robertson* v. *Rodriguez* (1995) 36 Cal.App.4th 347, 355 [42 Cal.Rptr.2d 464]; *Dixon* v. *Superior Court* (1994) 30 Cal.App.4th 733, 746 [36 Cal.Rptr.2d 687], review den.) It is recognized, with the requirement that the court consider the pleadings and affidavits of the parties, the test is similar to the standard applied to evidentiary showings in summary judgment motions pursuant to Code of Civil Procedure section 437c and requires that the showing be made by competent admissible evidence within the personal knowledge of the declarant. (*Ludwig* v. *Superior Court, supra*, at pp. 15-16.).[10] Averments on information and belief are insufficient. (*Evans* v. *Unkow, supra*, 38 Cal.App.4th at pp. 1493, 1497-1498; cf. *College Hospital,*

---

[10]Wollersheim and amici curiae implore this court to apply a heavier burden of proof, contending that "probability" means "more likely than not."

The legislative history reveals that the "probability" language was a compromise. A predecessor bill to Senate Bill No. 1264 was drafted as a pleading bar, requiring plaintiffs to obtain prefiling approval of any lawsuit arising out of a defendant's exercise of First Amendment or petition rights. Governor Deukmejian vetoed that bill. (*Wilcox* v. *Superior Court, supra*, 27 Cal.App.3d 809, 820.) Senate Bill No. 1264 originally contained a burden of proof requiring plaintiff to show a "substantial probability" of prevailing on the merits. In response to opposition to that standard, the bill was amended to the "probability" standard. The Legislature rejected a standard proposed by Governor Wilson: "sufficient evidence upon which a reasonable claim may be based." It is contended that the "probability" standard adopted was intended to require a plaintiff to show a "likelihood" or "51% chance" of prevailing. The "legislative history" cited for this interpretation is a letter from the Governor's office which states that there appeared to be no meaningful distinction between the "substantial probability" standard and the "reasonable probability" standard then being proposed. In

*Inc.* v. *Superior Court* (1994) 8 Cal.4th 704, 719 [34 Cal.Rptr.2d 898, 882 P.2d 894] [construing Code Civ. Proc., § 425.13, which requires a motion to amend a complaint to state a punitive damages claim against a health care provider].) As in a motion for summary judgment, the pleadings frame the issues to be decided. (See, e.g., *Dorado* v. *Knudsen Corp.* (1980) 103 Cal.App.3d 605, 611 [163 Cal.Rptr. 477].)

 Therefore, the Church was required to demonstrate by admissible evidence the probability that it would succeed in obtaining an injunction to set aside the former judgment in Wollersheim's favor on the ground of judicial bias during the conduct of the prior action. This it failed to do.

In order to establish the probability of success the Church had to present admissible evidence of judicial bias sufficient to void the judgment in the prior action. Courts applying the former judicial disqualification statute, Code of Civil Procedure section 170, subdivision (a), held that judgments of a disqualified judge were void. A void judgment is open to attack at any time. (*Cadenasso* v. *Bank of Italy* (1932) 214 Cal. 562, 567-568 [6 P.2d 944].) However, courts applying the new provisions, Code of Civil Procedure section 170 et seq., adopted in 1984, consider such judgments or orders merely voidable. (*Betz* v. *Pankow* (1993) 16 Cal.App.4th 931, 939-940 [20 Cal.Rptr.2d 841], and cases cited therein.)

Code of Civil Procedure section 170.1, subdivision (a)(6) provides for the disqualification of a judge if "For any reason . . . (B) the judge believes there is a substantial doubt as to his or her capacity to be impartial, or (C) a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial. Bias or prejudice towards a lawyer in the proceeding may be grounds for disqualification."

"The matter of disqualification should be raised when the facts constituting the grounds for disqualification are first discovered and, in any event, before the matter involved is submitted for decision. (*Baker* v. *Civil Service Com.* (1975) 52 Cal.App.3d 590, 594 . . . .) This rule applies, however, only when the facts constituting the disqualification are discovered before a

---

criticizing that standard as "fundamentally unfair," the letter stated that it "would require a plaintiff to have 51% of his or her case proven the day the suit is filed and before any discovery is taken." The bill's sponsor, Bill Lockyer, objected to the Governor's proposed standard, claiming it would "eviscerate the measure." The Governor signed the legislation with the "probability" standard.

In light of potential problems with the constitutional right to a jury trial, the courts have interpreted the plaintiff's burden in opposing a motion to strike pursuant to section 425.16 as requiring the demonstration of a prima facie case. (*Layfayette Morehouse, Inc.* v. *Chronicle Publishing Co., supra,* 37 Cal.App.4th 855, 867.) We are in accord with these authorities.

case is submitted for decision. The rule rests on the principle that a party may not gamble on a favorable decision. (*Ibid.*) . . . [C]ase law recognizes situations in which a party is entitled to relief even though the grounds for disqualification are not discovered until after judgment is entered. In such case, a statement of disqualification is timely if submitted at the 'earliest practicable opportunity' after the disqualifying facts are discovered." (*Urias* v. *Harris Farms, Inc.* (1991) 234 Cal.App.3d 415, 424-425 [285 Cal.Rptr. 659] [summary judgment granted by disqualified judge held to be voidable] review den.)[11]

In making our determination whether the Church has established a probability that it would prevail, we now consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based," (§ 425.16, subd. (b)), as discussed above.

■ An examination of the Church's complaint reveals an absence of any admissible evidence to demonstrate its claim. The allegations of fact in the complaint which are critical to the Church's claim of judicial bias are not admissible, even though the complaint is verified, because they were not within the personal knowledge of the verifier, the president of the Church. ■ Generally, a party cannot simply rely on the allegations in its own pleadings, even if verified, to make the evidentiary showing required in the summary judgment context or similar motions, such as plaintiff's motion to amend to include a punitive damage claim under section 425.13, subdivision (a). (*College Hospital Inc.* v. *Superior Court, supra*, 8 Cal.4th at p. 720, fn. 7.) The same rule applies to motions under section 425.16. Here, like motions under Code of Civil Procedure section 437c, the pleadings merely frame the issues to be decided. Similarly, an averment on information and belief is inadmissible at trial, and thus cannot show a probability of prevailing on the claim. (*Evans* v. *Unkow, supra*, 38 Cal.App.4th at pp. 1497-1498.) "An assessment of the probability of prevailing on the claim looks to *trial*, and the evidence that will be presented at that time. (See *Wilcox* v. *Superior Court, supra*, 27 Cal.App.4th at p. 824 . . . .) Such evidence must be *admissible*. (*Id.* at p. 830.)" (*Id.* at p. 1497, original italics.)

Wollersheim made a number of objections to the evidence the Church offered by declarations. Wollersheim's objections to portions of the declaration of Paul Moore on the grounds they were hearsay (Evid. Code, § 1200)

---

[11]Wollersheim's contention that the Church's complaint is an unsuccessful attempt to allege either intrinsic or extrinsic fraud is somewhat beside the point. Rather the complaint is an attempt to allege the judgment in the underlying action is void because the matter was tried before a judge who concealed his bias. Nevertheless, the Church failed to successfully plead or present evidence in opposition to Wollersheim's motion to support the essential basis for such a claim—facts of Judge Swearinger's alleged bias during the trial.

and irrelevant (Evid. Code, § 351) are properly sustained. Mr. Moore refers to a statement of Juror Terri Reuter, which showed on its face that she did not learn of the allegations concerning the judge's tires being slashed and the death of his dog until long after the verdict. Also Moore's report of her statements regarding statements of court personnel were inadmissible double hearsay. The declaration of Ms. Reuter to which Moore referred was not attached and was reportedly unsigned and never served on Wollersheim's counsel.

Wollersheim also properly objected to the declaration of Eric Lieberman, which consists of his statement about the statements of the reporter, Mr. Horne, regarding the statements made by the judge to Mr. Horne. This is inadmissible double hearsay. (Evid. Code, § 1200.)

Wollersheim objected to the declaration of Earle Cooley as irrelevant. It simply states that the judge never mentioned to Church counsel that his tires had been slashed or that his collie had drowned in his pool, and that the judge did not "reveal his belief or concern" that Church personnel were responsible for acts of harassment. Although Cooley's declaration may have some relevance to the issue of "discovery" of the alleged "new evidence" of bias, it contains no evidence of bias on the part of the judge.

Wollersheim also properly objected to statements in the declaration of Barry Van Sickle on the grounds of hearsay, untrustworthiness and relevancy. The declaration contains hearsay evidence of statements of the judge made six years after the trial in the prior action to one of Wollersheim's appellate counsel. The judge is reported to have said that he was willing to act as a facilitator to settlement as he did not want to see the case retried. These statements are irrelevant to the Church's claim of the existence of judicial bias during the trial itself.

The declaration of William T. Drescher also contains hearsay and multiple hearsay, relaying the statements of Judge Swearinger to him and the statements of Van Sickle regarding the judge's comments to him six years after trial and Wollersheim objected on that basis. The Church contends the statements are admissible under the state-of-mind exception. Wollersheim also objected to these statements as irrelevant to the Church's claim of bias at the time of trial and that objection is sustainable.

The unauthenticated copy of the American Lawyer article does not contain any competent evidence, as it too is multiple hearsay—the statements of Horne of the statements of Judge Swearinger. Furthermore, the quoted statements of the judge which indicate that he believed "funny stuff"

was occurring also indicate he did not "pay attention" to it. Therefore it is irrelevant, as Wollersheim contended.

In opposition to the Church's "evidence," Wollersheim submitted substantial admissible evidence that the jury members had no knowledge that the judge's tires were slashed or that his dog had died. There is evidence by declarations of court personnel that they were unaware of any bias on the part of the judge. Terri Reuter declares that she learned of the tire slashing and dog drowning "sometime well after the trial in the *Wollersheim* case was over."

■■■ Finally, we turn to the issue of the timeliness of the Church's lawsuit to set aside the verdict. An action to void a judgment based on judicial bias is timely if filed at the " 'earliest practicable opportunity' after the disqualifying facts are discovered." (*Urias* v. *Harris Farms, Inc.*, *supra*, 234 Cal.App.3d at p. 425.) Here, the Church also failed in carrying its burden. In its 1986 motion for new trial the Church raised the issue of Judge Swearinger's alleged bias and the possible contamination of the jury by Terri Reuter's unsigned declaration.

The Church's numerous claims of judicial and jury bias and prejudice were adjudicated at earlier stages of the litigation. Yet the Church waited seven years to file the instant lawsuit alleging the same facts to support its complaint. Clearly the Church is too late.

The trial court acted properly in granting Wollersheim's motion to strike the Church's complaint. This conclusion did not require weighing evidence as the Church failed to present a prima facie case supported by admissible evidence. This conclusion also obviates the need to address the various credible, potentially meritorious, defenses of laches, unclean hands and collateral estoppel presented by Wollersheim, except to observe that such defenses are to be considered if necessary in determining plaintiff's probability of success once the plaintiff has presented evidence of the probability of success. (§ 425.16, subd. (b).)

4. *The award of attorney fees was proper and supported by substantial evidence.*

■■■ Upon the motion of Wollersheim, the trial court awarded attorney fees pursuant to section 425.16, subdivision (c) in the amount of $130,506.71. In doing so, the trial court rejected Wollersheim's request to double the "lodestar" amount, the number of attorney hours expended multiplied by the hourly rates. (See *Serrano* v. *Priest* (1977) 20 Cal.3d 25

[141 Cal.Rptr. 315, 569 P.2d 1303].) The Church contends the total number of hours claimed was unreasonable and inexplicable, pointing out that the case was dismissed on the basis of pleadings and accompanying declarations.

■ " 'The matter of reasonableness of attorney's fees is within the sound discretion of the trial judge. [Citations.] Determining the weight and credibility of the evidence, especially credibility of witnesses, is the special province of the trier of fact. [Citation.]' [Citation.] 'In determining what constitutes a reasonable compensation for an attorney who has rendered services in connection with a legal proceeding, the court may and *should* consider "the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded . . . ; the intricacies and importance of the litigation, the labor and necessity for skilled legal training and ability in trying the cause, and the time consumed." [Citations.]' [Citations.]" (*Stokus* v. *Marsh* (1990) 217 Cal.App.3d 647, 656-657 [266 Cal.Rptr. 90].)

■ We find the trial court did not abuse its discretion in awarding attorney fees and that substantial evidence supports the award. Wollersheim's counsel submitted declarations of their experience and expertise providing information supportive of the rates charged by counsel as well as itemized accountings of attorney time. Wollersheim also submitted the declaration of an expert on attorney fees who opined that the rates requested by his counsel were "well within the range of market rates charged by attorneys of equivalent experience, skill and expertise." The Church has not presented any evidence in the record that the award was based upon unnecessary or duplicative work or any other improper basis.

*5. Wollersheim is entitled to an award of attorney fees on appeal.*

Wollersheim has asked this court to award him attorney fees on this appeal. Subdivision (c) of section 425.16 provides for an award of attorney fees to the defendant who successfully brings a motion to strike.

■ "A statute authorizing an attorney fee award at the trial court level includes appellate attorney fees unless the statute specifically provides otherwise. (*Morcos* v. *Board of Retirement* (1990) 51 Cal.3d 924, 927-929 . . . ; *Grade-Way Construction Co.* v. *Golden Eagle Ins. Co.* (1993) 13 Cal.App.4th 826, 837-838 . . . .)" (*Evans* v. *Unkow, supra*, 38 Cal.App.4th at pp. 1499-1500.) Section 425.16, subdivision (c) provides that a prevailing defendant is entitled to recover attorney fees and costs, and does not preclude recovery on appeal. (38 Cal.App.4th at p. 1500.)

Wollersheim is awarded his attorney fees on this appeal, the amount of which is to be determined by the trial court upon remand.

## DISPOSITION

Judgment of dismissal and judgment awarding attorney fees are affirmed. Wollersheim is awarded costs and attorney fees on appeal. The matter is remanded to the trial court to determine the amount thereof.

Klein, P. J., and Croskey, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 22, 1996. Kennard, J., was of the opinion that the petition should be granted.